# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 12-60754

United States Court of Appeals
Fifth Circuit

**FILED**

March 25, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

RAYMOND LAMONT SHOEMAKER, also known as Ray Shoemaker;
EARNEST LEVI GARNER, JR., also known as Lee Garner,

Defendants - Appellees

---

Consolidated with
No. 12-60791

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RAYMOND LAMONT SHOEMAKER, also known as Ray Shoemaker,

Defendant - Appellant

---

Appeals from the United States District Court
for the Northern District of Mississippi

No. 12-60754
Consolidated with
No. 12-60791

Before STEWART, Chief Judge, and GARZA and SOUTHWICK, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Earnest Levi Garner ("Garner") and Raymond Lamont Shoemaker ("Shoemaker") stood trial for various federal crimes arising from a bribe and kickback scheme involving a community hospital. The crimes included conspiracy, federal program bribery, paying and receiving healthcare kickbacks, embezzlement, and making false statements to federal agents. After the jury returned guilty verdicts on all counts, the district court entered judgments of acquittal and, in the alternative, granted new trials as to several of the counts. We resolve two appeals in this opinion: In No. 12-60754, the Government appeals the district court's judgments of acquittal and grants of new trials for Garner and Shoemaker, and in No. 12-60791, Shoemaker appeals the district court's denial of his motion for judgment of acquittal or new trial on the remaining counts, of which he alone was convicted. We vacate the district court's judgments of acquittal and grants of new trials, affirm Shoemaker's other convictions, and remand for reinstatement of the jury verdict and for sentencing.

## I

This case concerns a bribe and kickback scheme involving Tri-Lakes Medical Center ("TLMC"), a community hospital in Panola County, Mississippi.[1] In 2004, when the County owned 60% of TLMC, the County's Board of Supervisors appointed David Chandler ("Chandler") to serve as the

---

[1] Because both appeals concern judgments of acquittal, we present the facts in the light most favorable to the Government. *See United States v. Hanson*, 161 F.3d 896, 900 (5th Cir. 1998).

No. 12-60754
Consolidated with
No. 12-60791

Chairman of TLMC's Board of Trustees. Chandler had been the County Administrator for almost twenty years, and he was appointed to oversee the sale of the hospital on behalf of the Board of Supervisors. As Chairman, Chandler scheduled and set the agenda for hospital board meetings, contacted department heads for reports, and regularly dealt with Shoemaker, then TLMC's Chief Operating Officer ("COO").

Garner owned and operated a nurse staffing business known as Guardian Angel Nursing and, later, as On-Call Staffing, which provided temporary nurses to area hospitals. In early 2005, TLMC entered into a contract with Guardian Angel Nursing after Chandler had arranged two meetings between company representatives and Shoemaker. Soon thereafter, Chandler requested that Garner pay him $5 for every nursing hour his company billed at TLMC. According to Chandler, the $5 per hour was in return for Chandler's ensuring that TLMC used Garner's company for contract nurses and paid Garner's bills in a timely manner. About once a month, Garner would push Chandler to increase hours for his nurse staffing business at TLMC, and Chandler would lobby Shoemaker accordingly. A few months after this arrangement commenced, Chandler signed a board authorization giving Shoemaker a $50,000 raise. Upon Garner's request, Chandler created invoices that did not directly correlate to billed hours but rather looked as if they were for consulting or tax services; the memo "Accounting Fees" or "Accounting Services" appeared on checks from Garner.

In total, Garner paid Chandler $268,000 as a result of the agreement, and TLMC paid Garner's company approximately $2.3 million for nursing services. Shoemaker's executive assistant testified that Chandler, on behalf of Garner's company, regularly delivered invoices to and picked up checks

3

No. 12-60754
Consolidated with
No. 12-60791

directly from Shoemaker's office, while other vendors had no such billing practices. Moreover, Garner's nursing company was typically the first vendor paid by TLMC. Over the course of one year, when TLMC engaged a total of seven nursing companies, Garner's company received 40% of the hospital's business.

Meanwhile, in mid-2005, Robert Corkern ("Corkern") contracted to purchase TLMC. However, in order to secure financing, he needed a non-profit entity that would qualify for a loan backed by the United States Department of Agriculture ("USDA"). Shoemaker offered Corkern the use of a non-profit under his control called Kaizen, and Corkern transferred to Kaizen his right to purchase TLMC. Subsequently, Kaizen's name was changed to Physicians and Surgeons Hospital Group ("PSHG").

In the fall of 2005, Chandler signed on behalf of TLMC a contract providing PSHG with rights to purchase the hospital from Panola County and the City of Batesville. Thereafter, PSHG purchased TLMC for approximately $27 million. Once the sale was finalized, Chandler left the Board, and Shoemaker was promoted from COO to Chief Executive Officer ("CEO").

Soon thereafter, Shoemaker began claiming that Garner and Corkern owed him money. Just prior to the sale of the hospital, Chandler had arranged a meeting between Shoemaker and Garner at the Como Steakhouse. During the meeting, Garner excused Chandler from the table, whereupon Garner and Shoemaker conversed privately for approximately thirty minutes. After the sale of the hospital, Shoemaker demanded $25,000 from Chandler, claiming that Garner had "promised" that sum in return for Shoemaker's maintaining the flow of nursing hours and payments to Garner's business. Chandler recounted this conversation to Garner, who initially did not respond. Chandler

4

No. 12-60754
Consolidated with
No. 12-60791

then proposed that he would begin paying Shoemaker $2,000 per month, and Garner replied that he did not care what Chandler did as long as the money came out of Chandler's $5-per-hour fee. Chandler testified that he ultimately paid Shoemaker a total of $12,000 over six months.

Later, Shoemaker demanded that Corkern pay him $250,000 for providing use of the non-profit to acquire TLMC. Corkern refused, explaining that it was illegal to sell a non-profit entity. There was no mention in any sale or loan documents of any debt owed by Corkern to Shoemaker regarding the sale of the non-profit, and Corkern testified that Shoemaker had not demanded such payment initially.

Shoemaker ultimately secured $250,000, though not from Corkern. While the hospital was applying to GE Capital for a line of credit that had to be approved by the USDA, Shoemaker signed a letter to the USDA stating that the hospital desperately needed working capital for its day-to-day operations. The letter did not indicate that Shoemaker would also pay himself using the funds. That same month, Shoemaker signed a statement certifying that the loan would be used only for the hospital and would not be applied toward the obligations of any third parties or affiliates. On the day the line of credit was issued, Shoemaker went to TLMC's business office and had a check for $250,000 issued to Kaizen. No one in the business office knew that Shoemaker had previously owned Kaizen. When TLMC received its first draw under the GE line of credit, the $250,000 was replenished. Shoemaker later presented an invoice to the business office indicating that the payment to Kaizen was for "organizational costs." Shoemaker subsequently deposited the check into a bank account that he controlled.

No. 12-60754
Consolidated with
No. 12-60791

In October 2009, Federal Bureau of Investigation ("FBI") Special Agent Shannon Wright interviewed Shoemaker. At first, Shoemaker denied receiving $10,000 in checks from Chandler. Then he said he was "99% sure" he had not received any checks but that if he had, he would like to see them. Afterward, Shoemaker and Chandler agreed that they would call the payments a loan. Accordingly, the next time Agent Wright interviewed Shoemaker, he explained that Chandler had loaned him $10,000.

Chandler later began cooperating with the government and recording his consensual conversations with Garner. In one such conversation, Garner wondered if Chandler's payments to Shoemaker were "gonna be called bribery." They agreed to characterize the $5-per-hour arrangement as payments for "accounting" and "professional" services, and Garner insisted that the bill not disclose the arrangement or otherwise correspond with nursing hours. Later in that conversation, Garner said, "You know I told you . . . I . . . I didn't need to know who you paid . . . what you did." Although Chandler's testimony was inconsistent as to the meaning of Garner's statement, he ultimately explained that it referred to his payments to Shoemaker, and to Garner's earlier remark that he did not care what Chandler did with his $5-per-hour fee.

Shortly thereafter, Agent Wright and USDA Special Agent Keith Luke interviewed Garner. They asked Garner about the payments to Chandler, and Garner explained that certain larger payments constituted a "finder's fee" for securing business at TLMC. He also confirmed that he paid $5 for every hour that his company billed and collected at TLMC.

Garner and Shoemaker were subsequently charged in twelve counts of the Superseding Indictment. Both Garner and Shoemaker were charged with

No. 12-60754
Consolidated with
No. 12-60791

two counts of conspiracy in violation of 18 U.S.C. § 371: Count One charged conspiracy to violate 18 U.S.C. § 666 by bribing Chandler and Shoemaker, and Count Four charged conspiracy to violate 42 U.S.C. § 1320a–7b, based on the same facts alleged in Count One. Garner alone was charged in Count Two for violating 18 U.S.C. § 666 by bribing Chandler, and in Count Five for violating 42 U.S.C. § 1320a–7b, based on the same bribes. Shoemaker alone was charged in Count Three for receiving bribes, in violation of 18 U.S.C. § 666; in Count Six for soliciting and receiving healthcare kickbacks, in violation of 42 U.S.C. § 1320a–7b; in Count Seven for making false statements to the FBI, in violation of 18 U.S.C. § 1001; in Count Eight for conspiring to violate 18 U.S.C. § 1014 by making false statements to the USDA, in violation of 18 U.S.C. § 371; in Counts Nine through Eleven for making various false statements to the USDA, in violation of 18 U.S.C. §1014; and in Count Twelve for embezzlement of $250,000, in violation of 18 U.S.C. § 666.

After a nine-day trial, the jury found both Garner and Shoemaker guilty on all counts. Both defendants filed motions for judgment of acquittal on all counts or, in the alternative, a new trial. The district court then granted judgments of acquittal and, in the alternative, new trials to Garner as to Counts One, Two, Four, and Five, and to Shoemaker on Counts One and Four. As for Count Three, the district court denied Shoemaker's motion for judgment of acquittal but granted him a new trial. The district court denied Shoemaker's motions as to Counts Six through Twelve. Thus, no convictions stood against Garner. Shoemaker remained convicted of Counts Three and Six through Twelve.

The Government now appeals all judgments of acquittal and grants of new trials. Shoemaker appeals from his remaining convictions.

No. 12-60754
Consolidated with
No. 12-60791

**II**

The Government contends that the district court erred in granting judgments of acquittal to Garner on Counts One, Two, Four, and Five, and to Shoemaker on Counts One and Four. The district court determined that insufficient evidence supported each conviction, and on appeal, the Government challenges these determinations.

We give no deference to a district court's post-verdict judgment of acquittal. *United States v. Hanson*, 161 F.3d 896, 900 (5th Cir. 1998). Rather, we "decide *de novo* whether the relevant evidence, viewed in a light most favorable to the government, could be accepted by a jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). In considering the sufficiency of the evidence, we must bear in mind that the "jury is free to choose among reasonable constructions of the evidence," even when certain evidence conflicts or suggests innocence. *Id.* Although a district court may re-weigh evidence and assess witness credibility in considering a motion for new trial, it has "[n]o such discretion" when deciding a motion for judgment of acquittal. *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997).

**A**

Count One charged Garner and Shoemaker with conspiring to violate 18 U.S.C. § 666 by committing federal program bribery, in violation of 18 U.S.C. § 371. The district court read Count One to allege two distinct conspiracies— a conspiracy between Garner, Shoemaker, and Chandler to bribe Chandler in violation of 18 U.S.C. § 666, and a conspiracy between the same individuals to

No. 12-60754
Consolidated with
No. 12-60791

bribe Shoemaker, also in violation of § 666.[2]   The district court granted judgments of acquittal on Count One to Garner and Shoemaker because it found the Government's evidence insufficient for both conspiracies.

**1**

As to the first conspiracy in Count One, the district court reasoned that in order for the convictions to stand, the Government had to present evidence establishing that Chandler was an "agent" under 18 U.S.C. § 666 whom the conspiracy aimed to bribe.  According to the district court, the Government's evidence that Chandler was a TLMC board member and Panola County employee could not suffice.  Rather, the evidence at a minimum had to establish that Chandler possessed "control over the legal transactions of [TLMC] in ordering nursing services."

Section 666 criminalizes offering, giving, or agreeing to give anything of value to any person with intent to influence or reward an "agent" of an organization in connection with a transaction exceeding $5,000 in value, where the organization receives over $10,000 in federal funds over any one-year period.  18 U.S.C. § 666(a)(2).  The statute also prohibits an "agent" from soliciting, accepting, or agreeing to accept anything of value with the intent to be influenced or rewarded in connection with such transactions.  *Id.* § 666(a)(1)(B).[3]   "Agent" is defined as "a person authorized to act on behalf of

---

[2] Although the district court and Shoemaker interpret Count One to allege two conspiracies, the Government submits that Count One alleged only one conspiracy that "later expanded to include Shoemaker."  We decline to decide this issue, the significance of which was not adequately briefed on appeal.  To facilitate our analysis, we adopt the district court's bifurcation.

[3] The Superseding Indictment's language in Count One is broad and inclusive of both § 666(a)(2) and (a)(1)(B), alleging that the conspirators sought to "solicit, accept, offer and give anything of value . . . ."  Count Two uses the language of § 666(a)(2) in alleging that Garner "did . . . corruptly give, offer, and agree to give" a bribe.  Count Three uses the

No. 12-60754
Consolidated with
No. 12-60791

another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." *Id.* § 666(d)(1).

In *United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000), we considered the scope of the term "agent" in 18 U.S.C. § 666. Phillips was a Louisiana parish tax assessor who allegedly hired his political ally and the ally's wife in order to provide them with health insurance benefits. In return, the couple paid their salaries to Phillips as a kickback. The jury was instructed that Phillips was an "agent" of the parish if he had authority to act on its behalf and that tax assessors are "parish officers" under Louisiana law. The jury then convicted Phillips and his ally for theft involving a federal program in violation of § 666. *Id.* at 407–10. On appeal, we considered whether the evidence sufficiently established that Phillips was an "agent" of the parish within the meaning of § 666.

We held that "'agent' . . . should be construed . . . to tie the agency relationship to the authority that a defendant has with respect to *control and expenditure of the funds of an entity* that receives federal monies." *Id.* at 415 (emphasis added). Put simply, an agent is someone authorized to act on behalf of the organization or government not only in a general manner, but "with respect to its funds" in particular. *Id.* at 413.[4] Applying this test, we observed

language of § 666(a)(1)(B) in charging that Shoemaker, as an agent of TLMC, "did . . . corruptly solicit, demand, accept, and agree to accept" a bribe.

[4] *See also United States v. Brown*, 727 F.3d 329, 338 (5th Cir. 2013) (applying *Phillips* to theft offense under 18 U.S.C. § 666(a)(1)(A) and holding that sufficient evidence supported jury verdict given that Government's evidence showed that co-conspirator was "agent" who "was authorized to act on behalf of the [covered entity] with respect to its funds"); *United States v. Whitfield*, 590 F.3d 325, 344–47 (5th Cir. 2009) (applying *Phillips* and reversing convictions where alleged agents had no authority over covered organization's funds when acting in the transaction at issue).

No. 12-60754
Consolidated with
No. 12-60791

first that under Louisiana law, assessment districts were "independent of parish government"; tax assessors were not parish officers; and the parish had no power to control or determine salaries of tax assessors. *Id.* at 412. We further reasoned that nothing in the record showed that Phillips had any "legal authority to bind the parish." *Id.* at 413. We explained that "because Phillips, as a matter of law, was not an employee or officer of the parish and because he was not authorized to act on behalf of the parish with respect to its funds, Phillips's actions did not and could not have threatened the integrity of federal funds or programs." *Id.* Thus, we concluded that Phillips was not an agent of the parish for the purposes of § 666.

Here, we conclude that Chandler is an "agent" within the meaning of § 666 as interpreted in *Phillips*.[5] As a textual matter, § 666 lists "director" and "officer" as examples of agents, and Chandler, as the Chairman of TLMC's Board of Trustees, fell within this statutory definition. 18 U.S.C. § 666(d)(1). Moreover, Chandler "was authorized to act on behalf of [the hospital] with respect to its funds." *Phillips*, 219 F.3d at 411. Chandler scheduled and set the agenda for hospital board meetings, contacted department heads for

---

[5] We observe that Chandler's "agent" status is not a necessary element of the offense charged in either Count One or Count Two of the Superseding Indictment. 18 U.S.C. § 666(a)(2) criminalizes giving or offering anything of value to "any person, with intent to influence or reward an agent of [a covered] organization . . . ." Thus, by the plain text of the statute, it suffices for Count One that the conspirators agreed to have Garner give money to Chandler, who is "any person," with intent to influence Shoemaker, who—the parties do not dispute—is an agent of TLMC as its COO and CEO. Likewise, for Count Two, evidence that Garner paid Chandler with intent to influence Shoemaker would be sufficient. For both counts, evidence of the intent to influence Shoemaker was sufficient, as explained below in our discussion of Count Four. Therefore, proving Chandler's status as "agent" is superfluous. But because the jury instructions for Count Two (the substantive counterpart to the first conspiracy in Count One) required a finding that Chandler is an agent, and because the parties' briefing on Count One explores this question at length, we proceed to explain why Chandler is an agent under § 666.

11

No. 12-60754
Consolidated with
No. 12-60791

reports at board meetings, and worked closely with Shoemaker, the COO and, later, CEO. Most significantly, Chandler signed a board authorization giving Shoemaker a $50,000 raise and signed a contract on behalf of the hospital providing PSHG with the rights to purchase the hospital.[6] While Phillips was "organizationally removed" from the parish's funds because he was not an officer of the parish, Chandler, as Chairman of TLMC's board, was at the top of the relevant organization and had full authority over its funds. *Id.*

The district court erred by pronouncing a new requirement that the "agent" have direct authority over the ultimate decision targeted by the bribe— here, the "authority to order temporary nurses from providers, such as Guardian Angel, on a day-to-day as-needed basis." This requirement is absent from both the statute and *Phillips*, which collectively require only that an agent have general authority to act for the organization and to control its funds. *Id.* at 411.[7] Because lines of authority are often blurred, to criminalize

---

[6] Because Chandler's status as an "agent" of TLMC suffices to sustain the convictions, we do not decide whether Chandler was also an "agent" of Panola County.

[7] Since *Phillips*, we have suggested that a broader definition of "agent" is more faithful to the statutory text and purpose and to our earlier decisions addressing § 666. In *United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002), we held that because a city council member qualified as an "agent" of his city under § 666, the district court had jurisdiction to convict him. *Id.* at 315–16. We explained that *Phillips* added "extra-textual teeth" to the "agent" definition by requiring the agent to have power over the organization's funds, and that this additional requirement was potentially in tension with earlier cases. *Lipscomb*, 299 F.3d at 313; *see also id.* at 314 ("We acknowledge that it is at least arguable . . . that this 'organizationally removed' language [of *Phillips*] conflicts with *Westmoreland* and *Moeller*, even though . . . the *Phillips* panel may be perceived as having favored the 'funds focus' for § 666. To the extent that there is a conflict, however, the older case controls . . . ."); *id.* (explaining that "corruption focus" of *Westmoreland* "has never been overruled either by this court en banc or by the Supreme Court"). Likewise, the First, Third, Sixth, Seventh, and Eleventh Circuits have rejected the narrower approach of *Phillips*. *See United States v. Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013); *United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007); *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007); *United States v. Spano*, 401 F.3d 837, 839–41 (7th Cir. 2005); *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012).

No. 12-60754
Consolidated with
No. 12-60791

only bribes paid to individuals with direct, formal authority to effect a desired outcome would render § 666 virtually meaningless.[8]

Alternatively, the district court's opinion might be read to mean that 18 U.S.C. § 666 prohibits *successful* bribes, regardless of the recipient's official authority.[9]  By this logic, despite Chandler's lack of formal authority over nurse staffing, if the Government had introduced evidence that he disregarded protocols and actually channeled business to Garner's company, then his conviction might have been saved.  Citing testimony that nurse staffing decisions were based solely on demand and vendor availability, the district court concluded that no evidence established that Chandler actually influenced decisions to give business to TLMC.

To the extent that the district court concluded that proof of an actual *quid pro quo* was necessary to sustain the convictions, it erred as a matter of

---

Moreover, the *Phillips* majority's concern about avoiding constitutional doubts now itself rests on doubtful foundations.  *See Phillips*, 219 F.3d at 414–15 (discussing limits of Spending Clause powers).  In *United States v. Sabri*, 541 U.S. 600 (2004), the Supreme Court held that § 666 is not facially unconstitutional for failing to require "any connection" between the bribe and federal funds.  *Id.* at 604.  The Court reasoned that the Spending Clause gives Congress authority to appropriate federal funds for the general welfare, and that the Necessary and Proper Clause embraces power to protect the integrity of those funds using § 666, even when the bribe does not result in a direct misuse of federal resources.  *Id.* at 605–606.

Nonetheless, *Phillips*'s narrower approach remains good law, *see Brown*, 727 F.3d at 338, and it does not require federal funds to be directly linked either to the bribe or to the agent.  *See Phillips*, 219 F.3d at 411 ("[T]he funds in question need not be purely federal, nor must the conduct in question have a direct effect on federal funds.").  Neither, under *Phillips*, must the agent have *direct* authority over the outcome that is the object of the bribe, contrary to the district court's interpretation.  We are thus satisfied that under *Phillips*, and on the evidence in the record, Chandler was an "agent" under § 666.

[8] *See Fischer v. United States*, 529 U.S. 667, 678 (2000) ("[T]he language of [§ 666] reveals Congress'[s] expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs.").

[9] On appeal, Shoemaker seems to defend both interpretations of the district court's opinion: "Chandler testified that he could not affect a single nursing hour and did not influence anyone to enter the nursing contract with Garner's company."

No. 12-60754
Consolidated with
No. 12-60791

law.  Nothing in *Phillips* or the relevant statutes requires that the bribe at issue be successful.  A conspiracy under 18 U.S.C. § 371 requires only a knowing agreement to commit an unlawful act against the United States and an overt act by one of the co-conspirators in furtherance of the conspiracy.  *See United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010).  In Count One, the unlawful act is that proscribed by § 666, which requires only that the bribe-giver "corruptly" offer or give a bribe "*with intent* to influence or reward" the agent.  18 U.S.C. § 666(a)(2) (emphasis added).  Here, the Government introduced ample evidence of the corrupt intent behind the payments in question—Chandler's testimony that he requested Garner pay him $5 per nursing hour in return for his securing business, and that Garner would periodically push Chandler to increase nursing hours.  Neither the Superseding Indictment nor the jury instruction includes any requirement that Garner actually benefited from his bribe, and this absence accords with the requirements of both § 371 and § 666.[10]

**2**

Regarding the second conspiracy in Count One, in which Garner, Shoemaker, and Chandler allegedly conspired to bribe Shoemaker, the district

---

[10] Of course, evidence of a successful scheme is not wholly irrelevant, as it is probative of the intent behind the alleged bribe payments.  But here, other evidence of intent was sufficient.  Moreover, whether the bribe actually succeeded is a basic question of fact for the jury: The "jury is free to choose among reasonable constructions of the evidence," *Hanson*, 161 F.3d at 900, as well as make credibility determinations, *Robertson*, 110 F.3d at 1117.  Here, the jury might have disbelieved the TLMC nurse staffer's testimony that others never interfered with her decisions or, alternatively, understood Chandler to wield influence more indirectly or surreptitiously, without exercising direct authority to choose nursing companies, which he testified that he did not have.  Additionally, the jury might have been persuaded by the fact that Garner's company captured 40% of TLMC's business during one year.

No. 12-60754
Consolidated with
No. 12-60791

court found that the Government failed to introduce any evidence of the underlying agreement.

To obtain convictions under 18 U.S.C. § 371, the Government must prove "an agreement between two or more persons to pursue an unlawful objective," among other elements. *Coleman*, 609 F.3d at 704. "To be a conspiracy, an express, explicit agreement is not required; a tacit agreement is enough." *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997). A conspiracy may be proven with only circumstantial evidence or "inferred from a concert of action." *United States v. Virgen-Moreno*, 265 F.3d 276, 284–85 (5th Cir. 2001) (internal quotation marks and citation omitted). Furthermore, "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991). Additionally, "the jury is the ultimate arbiter of the credibility of a witness," and "testimony generally should not be declared incredible as a matter of law" unless it pertains to matters "that the witness physically could not have observed or events that could not have occurred under the laws of nature." *Id.*

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that evidence of the agreement between Garner, Shoemaker, and Chandler to bribe Shoemaker was sufficient to support the convictions. Chandler testified that Shoemaker demanded $25,000 from him, claiming that Garner had "promised" that amount in return for Shoemaker's maintaining nursing hours for Garner's business. Chandler further testified that he recounted this conversation to Garner, who did not respond immediately, and that when Chandler then proposed that he would begin paying Shoemaker

15

No. 12-60754
Consolidated with
No. 12-60791

$2,000 per month, Garner said that he did not care what Chandler did as long as the money came out of Chandler's $5-per-hour fee. Although Garner did not agree to give his own money directly to Shoemaker, he acquiesced in Chandler's proposal to pay Shoemaker. Garner thereby agreed to the plan to compensate Shoemaker for his cooperation, to which plan both Chandler and Shoemaker agreed as well. While the above "uncorroborated testimony" would suffice, *Osum*, 943 F.2d at 1405, Chandler's testimony was corroborated by other evidence. First, in tape-recorded exchange, Garner told Chandler, "You know I told you . . . I . . . I didn't need to know who you paid . . . what you did." Chandler testified that Garner's comment referred to Chandler's payments to Shoemaker, and to Garner's earlier remark that he did not care what Chandler did with his $5-per-hour fee. Additionally, the Government introduced evidence of Chandler's monthly payments to Shoemaker, which totaled $12,000.

Notwithstanding this evidence, the district court found that there was "no substantive testimony" bearing on the agreement between Garner and Shoemaker. The district court based this finding solely on the fact that at the Como Steakhouse, Chandler had been excused from the table and therefore could not testify about that specific conversation. The district court further observed that "[t]he only persons present at the time in question [at the Como Steakhouse] were Garner and Shoemaker, and no evidence was presented by them of any such agreement."

The district court's reasoning misunderstands its limited task in ruling on a motion for a judgment of acquittal. In effect, the district court concluded that the Government was required to prove the agreement between the three individuals with direct evidence of a specific exchange between Garner and

16

No. 12-60754
Consolidated with
No. 12-60791

Shoemaker.  But there was ample circumstantial evidence—even a "concert of action"—in the form of Chandler's testimony about Shoemaker's demand for $25,000 and reference to Garner's promise,[11] Garner's acquiescence, and Chandler's payments.  *Virgen-Moreno*, 265 F.3d at 284–85.  The district court's

---

[11] Furthermore, the district court's *Bourjaily* concerns are misplaced.  In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court held that a trial court may admit co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) upon finding that the requirements of that rule are satisfied based on a preponderance of the evidence, where such evidence is not subject to evidentiary rules, except those on privilege, and may include the statements in question.  *Id.* at 175–78 (discussing treatment of preliminary questions under Fed. R. Evid. 104(a)).  Here, the district court noted in passing that "no *Bourjaily* findings were made or asked to be made prior to the prosecution eliciting this testimony from Chandler [regarding Shoemaker's claim that Garner had 'promised' him $25,000]."  On appeal, Shoemaker, also citing *Bourjaily* in passing, claims that the district court "properly rejected this hearsay testimony . . . ."

First, we note that neither Garner nor Shoemaker objected to the testimony at trial, and their motions for judgment of acquittal or new trial did not mention any hearsay problem, let alone *Bourjaily*.  While the district court "may on its own consider whether the evidence is insufficient to sustain a conviction," Fed. R. Crim. P. 29(a), we know of no authority establishing a district court's power to base a judgment of acquittal on its *sua sponte* exclusion of evidence admitted at trial without objection.  *But cf. Webster v. Duckworth*, 767 F.2d 1206, 1215 (7th Cir. 1985) (discussing Ninth Circuit cases that permit district court to grant new trial if some admitted evidence should have been excluded, and remaining evidence would have been insufficient).

Second, even if Shoemaker's statement about Garner's promise would have been barred following a *Bourjaily* hearing, there was no plain error because Garner and Shoemaker's "substantial rights" were not affected, *United States v. Montes-Salas*, 669 F.3d 240, 247 (5th Cir. 2012), since other admissible testimony would have been sufficient to support the conspiracy convictions.  First, Chandler stated that Shoemaker said, "I don't know what's going on, but I've held up the end of my deal, but I am not getting – that Lee hadn't held up the end of his deal."  This statement is a party-opponent admission, admissible against Shoemaker, and supports his conspiracy conviction on Count One because it establishes his agreement with the other individuals that he should be receiving bribes.  Fed. R. Evid. 801(d)(2)(A).  Later, when Chandler offered to pay Shoemaker $2,000 a month, Garner said that "he didn't care who or what [Chandler] paid as long as it came out of [Chandler's] $5 an hour."  Garner's response is a party-opponent admission as well and supports Garner's conspiracy conviction on Count One because it establishes his agreement with the others to provide Shoemaker with bribes (via Chandler).  Thus, even without Shoemaker's reference to Garner's promise, a rational jury could have found beyond a reasonable doubt that Garner, Shoemaker, and Chandler conspired to violate 18 U.S.C. § 666.

17

No. 12-60754
Consolidated with
No. 12-60791

faulting the Government for not presenting to the jury the precise words spoken during the Como Steakhouse conversation upends the principle that "tacit agreement is enough" to establish a conspiracy. *Westbrook*, 119 F.3d at 1189. Moreover, even assuming that Garner and Shoemaker never agreed directly with each other to enter into the conspiracy, we conclude that the convictions are adequately supported by evidence of Garner's verbally agreeing to let Chandler pay Shoemaker, and Chandler's tacitly agreeing with Shoemaker by making the requested payments.[12] Alternatively, the district court's summary rejection of Chandler's testimony amounts to an impermissible credibility judgment. Because Chandler did not speak about matters that he "physically could not have observed or events that could not have occurred under the laws of nature," his credibility was an issue for the jury. *Osum*, 943 F.2d at 1405.

Accordingly, because sufficient evidence supported all requisite elements of the conspiracies to bribe Chandler and Shoemaker, we hold that the district court erred in granting Garner's and Shoemaker's motions for judgment of acquittal on Count One.

**B**

Count Two charged Garner with federal program bribery in violation of 18 U.S.C. § 666. The facts alleged in Count Two were the substantive counterpart to the first conspiracy charged in Count One: That is, Garner allegedly carried out the conspiracy by actually bribing Chandler.

The district court granted Garner's motion for judgment of acquittal on Count Two on the grounds that no evidence demonstrated that Chandler was

---

[12] *See United States v. Payne*, 99 F.3d 1273, 1279 n.6 (5th Cir. 1996) (explaining chain conspiracy, in which "each link may not know the entire chain").

18

No. 12-60754
Consolidated with
No. 12-60791

an "agent" under § 666.  For the reasons discussed above, *see supra* Part II.A.1, the district court erred.  Additionally, we reject Garner's contention that evidence of the requisite *mens rea* was insufficient.  *See* 18 U.S.C. § 666(a)(2) (criminalizing bribes offered "corruptly").  The jury heard Chandler's testimony that Garner sought to conceal the link between the bribes and nursing hours, and pursuant to this plan, the memo "Accounting Fees" or "Accounting Services" appeared on the checks that Garner gave to Chandler.  The jury acted well within its power to "choose among reasonable constructions of the evidence" by crediting Chandler's testimony, especially in light of the checks. *Hanson*, 161 F.3d at 900.

The district court thus erred in granting a judgment of acquittal to Garner on Count Two.

**C**

Premised on the same facts as Count One, Count Four charged Garner and Shoemaker with conspiracy to violate 42 U.S.C. § 1320a–7b by providing healthcare kickbacks, in violation of 18 U.S.C. § 371.  The district court read Count Four, like Count One, as alleging two distinct conspiracies—a conspiracy between Garner, Shoemaker, and Chandler to pay kickbacks to Chandler in violation of 42 U.S.C. § 1320a–7b(b)(2)(B), and a conspiracy between the same individuals to pay kickbacks to Shoemaker also in violation of § 1320a–7b(b)(2)(B).[13]  The district court granted judgments of acquittal on Count Four to Garner and Shoemaker because it found fatal omissions in the Government's proof of both conspiracies.  With respect to the first conspiracy,

---

[13] The factual allegations of Counts One and Two are identical to those of Counts Four and Five; the two pairs of counts differ only in the statutory basis of the charges: 18 U.S.C. § 666 underlies Counts One and Two, while 42 U.S.C. § 1320a–7b(b)(2)(B) underlies Counts Four and Five.

No. 12-60754
Consolidated with
No. 12-60791

the district court reasoned that no evidence established that Chandler was a "relevant decisionmaker" under § 1320a–7b(b)(2)(B). With respect to the second, the district court found that there was no evidence of any agreement underlying the conspiracy.[14]

**1**

Regarding the first conspiracy in Count Four, the district court reasoned that in order for the convictions under 42 U.S.C. § 1320a–7b(b)(2) to stand, the Government had to present evidence establishing that Chandler was a "relevant decisionmaker." The district court concluded that because "[i]t is undisputed that Chandler had no decision-making authority in regard to the actual procurement of nursing staff," he could not be a "relevant decisionmaker."

Enacted as part of the Medicare-Medicaid Anti-Fraud and Abuse Amendments, 42 U.S.C. § 1320a–7b(b)(2) criminalizes the payment of remuneration under two related circumstances:

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering

---

[14] Again, as with Count One, in order to facilitate our review of the district court's opinion, we assume without deciding that two separate conspiracies were alleged.

No. 12-60754
Consolidated with
No. 12-60791

> any good, facility, service, or item for which
> payment may be made in whole or in part
> under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof,
> shall be fined not more than $25,000 or imprisoned for
> not more than five years, or both.

42 U.S.C. § 1320a–7b(b)(2)(A), (B).   Thus, the statute prohibits payments to "any person," so long as the payment is made with the requisite intent: The payer must "knowingly and willfully" offer or make a payment to induce the recipient either "to refer an individual to a person" for the provision of a covered healthcare good or service under subsection (A), or "to purchase, lease, order, or arrange for or recommend" procuring a covered healthcare good or service under subsection (B).

Here, applying the statute and viewing the evidence in the light most favorable to the jury's verdict, we hold that sufficient evidence supported Garner's and Shoemaker's convictions for conspiring to pay Chandler with the intent "to induce [Chandler to] arrange for or recommend" procuring nursing services from Garner.   42 U.S.C. § 1320a–7b(b)(2)(B).   The Government introduced evidence that Chandler requested that Garner pay him $5 per hour for every nursing hour billed and collected at TLMC—payments that, according to Chandler, were in return for his ensuring that TLMC used Garner's company for contract nurses.   About once a month, Garner would push Chandler to increase his company's nursing hours at TLMC, and Chandler would lobby Shoemaker accordingly.   Moreover, Chandler testified that he ultimately paid Shoemaker a total of $12,000 over six months in order

21

No. 12-60754
Consolidated with
No. 12-60791

to maintain influence over Shoemaker.[15]   In short, the evidence sufficiently established that a conspiracy existed to violate 42 U.S.C. § 1320a–7b(b)(2)(B) by paying Chandler—a recipient who was "any person"—to induce him to recommend that Shoemaker direct business to Garner's company.[16]

The district court, however, read *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), to limit drastically the meaning of "any person," such that liability cannot attach unless the "person" who receives remuneration is a "relevant decisionmaker" with formal authority to effect the desired referral or recommendation.[17]   The Government, Shoemaker, and Garner all agree that the district court's reading of *Miles* is correct; the Government submits only that Chandler was in fact a "relevant decisionmaker" by virtue of his role in TLMC's senior administration.  But as explained below, *Miles* imposed no such limitation on the meaning of "any person" and is wholly inapplicable to this case.

In *Miles*, we considered whether sufficient evidence supported convictions under § 1320a–7b(b)(2)(A) for alleged healthcare kickbacks paid in return for advertising services. *Id.* at 480.  The *Miles* defendants were owners of APRO, a home healthcare company.  Premier, a public relations firm, distributed promotional materials about APRO to local doctors' offices.  After

---

[15] When asked why he made the payments to Shoemaker, Chandler explained: "It was requested or I – it was requested – I felt like I needed to do that to – for an obligation that was due."   In explaining why he stopped the payments before paying the full $25,000 requested by Shoemaker, Chandler testified: "I just felt like it was double dipping. . . . [I]n my mind, he had already had the 25 and was getting some more off of me, and I just quit."

[16] As with violations of 18 U.S.C. § 666, whether the kickbacks actually generated incrementally more business for Garner is immaterial under 42 U.S.C. § 1320a–7b(b)(2). *See supra* Part II.A.1.

[17] The district court opinion states: "The Fifth Circuit has held that under a reading of section 1320a–7b, the payment for services must be made to a 'relevant decision maker' with respect to the services for which an alleged kickback is paid."

22

No. 12-60754
Consolidated with
No. 12-60791

a physician decided to use APRO's services for a patient, the physician would contact Premier, which then furnished APRO with billing information. *Id.* at 479. For every patient who used APRO's services because of Premier's advertising, the defendants paid Premier $300. *Id.* We prefaced our analysis by explaining that "[t]he only issue in dispute is whether Premier's activities constituted *referrals* within the meaning of the statute," as the statute only criminalizes payments with the intent to induce such referrals. *Miles*, 360 F.3d at 480 (emphasis added).[18] We reasoned that "[t]here was no evidence that Premier had any authority to act on behalf of a physician in *selecting* the particular home health care provider." *Id.* at 480. We explained that "[t]he payments from APRO to Premier were not made to the relevant decisionmaker as an inducement or kickback for sending patients to APRO." *Id.* Accordingly, we concluded that "APRO's payments to Premier were not illegal kickbacks" prohibited by 42 U.S.C. § 1320a–7b(b)(2)(A), and vacated the relevant convictions.[19]

---

[18] Under subsection (A), the requisite culpable intent is determined in part by the meaning of "referrals": Payments must be made "to any person to induce such person . . . *to refer* an individual to a person" for the provision of healthcare goods or services. 42 U.S.C. § 1320a–7b(b)(2)(A) (emphasis added).

[19] *Miles* concerned subsection (A), whereas here, Count Four charged Garner and Shoemaker under subsection (B). Unlike subsection (A)'s requirement that the payer intend to have the payee "refer an individual to a person," subsection (B) criminalizes payment with intent to have the payee "recommend" healthcare goods or services. In *Miles*, the appellants contended that because the term "recommend" in subsection (B) reaches a wider range of activity (including their passive advertising) than does the act of "referral" in subsection (A), "their payments to third parties such as Premier may only be prosecuted under subsection (B)," and their convictions under subsection (A) were accordingly invalid. *Miles*, 360 F.3d at 480 n.3. We had no occasion in *Miles* to consider the distinction between "referral" and "recommendation" and similarly decline to do so today, but we note that the Seventh Circuit has roundly rejected this distinction. *See United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999).

No. 12-60754
Consolidated with
No. 12-60791

Thus, *Miles* drew a distinction not between types of *payees*—"relevant decisionmakers" and others—but between a *payer*'s intent to induce "referrals," which is illegal, and the intent to compensate advertisers, which is permissible. Moreover, the factual and procedural context of that case constrained our holding. *Miles* accordingly stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 42 U.S.C. § 1320a–7b(b)(2)(A). *Miles*, 360 F.3d at 480. [20]

*Miles* is inapplicable to the facts before us. Here, advertising services are not at issue. Moreover, sufficient evidence established that the payments to Chandler aimed to induce him to "recommend" Garner's company. 42 U.S.C. § 1320a–7b(b)(2)(B). That is, in paying Chandler, Garner was not asking for a brochure bearing his company's name to be distributed to TLMC staff; rather, enough evidence showed that he wanted Chandler to exploit his personal

---

[20] This distinction in *Miles* between undue influence and mere advertising finds a helpful analogue in the Supreme Court's jurisprudence on lawyers' commercial speech. In *Shapero v. Kentucky Bar Association*, 486 U.S. 466 (1988), the Court distinguished between lawyers' in-person solicitation on the one hand, and direct-mail solicitation on the other. The Court explained that the latter, like print advertising, "poses much less risk of overreaching or undue influence," and accordingly held that a state may not subject lawyers' direct-mail solicitation to a blanket prohibition without offending the First and Fourteenth Amendments. *Id.* at 475–76 (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 642 (1985)). By contrast, states may constitutionally ban in-person solicitation by attorneys given that preventing "fraud, undue influence, . . . and other forms of vexatious conduct" is a compelling interest, and because such a prophylactic rule is necessary to further this interest. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462–68 (1978) (internal quotations omitted).

No. 12-60754
Consolidated with
No. 12-60791

access to TLMC executives, including Shoemaker, and to ensure that TLMC favored Garner's company when it chose nursing services. This conduct is an archetypal example of the undue influence prohibited by the statute.

Contrary to the district court's opinion and the parties' submissions, we did not hold in *Miles* that a payee with "relevant decisionmaker" status is an independent, substantive requirement of the statute. Such a novel move would be tantamount to re-writing the statutory text, which, as noted above, criminalizes payments to "any person[s]," so long as they are made with the requisite intent. *See United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999) ("The different subsections [(A) and (B)] do not distinguish between physicians and lay-persons."). Rather, we merely used the term "relevant decisionmaker" as shorthand—to characterize remuneration recipients who were paid with the culpable intent to induce "referrals." *Miles*, 360 F.3d at 480. Premier, as a public relations firm that did not unduly influence doctors through its advertising services, could not have been paid with the requisite corrupt intent to induce such "referrals"; therefore, it was not a "relevant decisionmaker." *Id.* In short, this label merely represents the statute's requirement that remuneration must be paid with certain illegal ends in mind.

The consequences of the district court's reading of the statute and *Miles* would be untenable. By its logic, if a bribe-giver wanted to avoid liability, he could simply identify the individual with direct operational authority over the desired decision, and bribe a manager who is at least one level removed in the chain of command, since the manager would have no direct, formal, day-to-day authority over the targeted decision. Alternatively, he could also avoid liability by paying a third party external to the organization to, in turn, bribe the decisionmaker within the organization. Such a view of the law ignores the

25

No. 12-60754
Consolidated with
No. 12-60791

statutory text, which limits liability not by narrowing the field of "any person," but by defining culpable intent. Indeed, *intent* was the focus of our inquiry in *Miles*—specifically the question of whether the evidence could establish intent to induce "referrals." *Id.* at 480.[21] The focus on intent, not titles or formal authority, also accords with Congress's concerns in enacting the statute—to broaden liability to reach operatives who leverage fluid, informal power and influence. *Cf. Polin*, 194 F.3d at 866 (concluding that reading § 1320a–7b(b)(2) to criminalize only payments to physicians who select pacemaker monitoring service providers, and not payments to a pacemaker salesperson who influences physicians' choices, is "clearly a perversion of the Act").[22]

---

[21] At least two other courts have explicitly rejected the district court's reading of *Miles*, which reading requires that payments be made to a "relevant decisionmaker" as a prerequisite for any liability under the statute. In *United States v. Krikheli*, 2009 WL 4110306 (E.D.N.Y. 2009) (unpublished), the U.S. District Court for the Eastern District of New York rejected the argument that § 1320a–7b(b)(2)(A) criminalizes only payments to "decision-makers" and explained that *Miles* concerned a sufficiency-of-evidence challenge and the meaning of "referral" and did not establish a broad legal holding limiting the scope of "any person" in the statute. *See id.* at *4–6. Following their conviction, the defendants in *Krikheli* raised the same *Miles* claim on appeal in challenging the sufficiency of evidence, but the Second Circuit affirmed the convictions even "[a]ssuming, without deciding" that *Miles* was correctly decided. *United States v. Krikheli*, 461 F. App'x 7, 9 (2d Cir. 2012) (unpublished). But in making this assumption, the Second Circuit correctly interpreted our narrow holding in *Miles*. *Id.* (explaining *Miles* as holding "that medical provider could not be convicted under 42 U.S.C. § 1320a–7b(b)(2)(A) merely for hiring agency to send advertisements and promotional materials to physicians, and then paying agency for each patient referred"). *But see United States v. Vernon*, 723 F.3d 1234, 1254–56 (11th Cir. 2013) (accepting that *Miles* stands for proposition that kickback must be paid to a "relevant decisionmaker" in order for liability to attach, but distinguishing *Miles* on factual grounds).

[22] The penalties originally provided in the Social Security Act for Medicare fraud were much more limited and covered only the solicitation, offer, or receipt of kickbacks, bribes, or rebates by "[w]hoever furnishes [Medicare] items or services." *See* Social Security Amendments of 1972, Pub. L. 92-603, § 242(b), 86 Stat. 1419. In 1977, Congress passed amendments aiming to "clarify and restructure" the penalty provisions. H.R. Rep. 95-393, pt. 2, at 53 (1977). The statutory language devised by Congress no longer required that bribes be paid or received by the direct "furnish[er]" of the healthcare goods or services, or that the payment be termed a "kickback," "bribe," or "rebate." Rather, the amendments "make subject to the penalty provisions any person who solicits or receives any remuneration" in return for

No. 12-60754
Consolidated with
No. 12-60791

**2**

We need not dwell at length on the district court's grant of a judgment of acquittal as to the second conspiracy alleged in Count Four—the conspiracy to pay kickbacks to Shoemaker. The district court's reasoning hinged on the finding that the Government introduced no evidence of the content of the Como Steakhouse conversation. As discussed above with respect to the parallel conspiracy charge in Count One, evidence of the overall agreement was sufficient. *See supra* Part II.A.2.[23]

---

prohibited referrals or recommendations and "any person who offers or pays any remuneration" in order to induce the payee to make such referrals or recommendations. *Id.*; *see* Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. 95-142, § 4(a), 91 Stat. 1179; *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("The phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates."). Here, the district court's incorrect application of *Miles* defeats Congress's objective of broadening the reach of the Medicare anti-fraud provisions.

[23] The Government further points to an apparent inconsistency in the district court's final judgment: The district court granted Shoemaker a judgment of acquittal on Count Four, but not Count Six. The Government submits that this decision necessarily meant that the district court determined that, for the purposes of Count Six, Shoemaker was a "relevant decisionmaker" under *Miles* and 42 U.S.C. § 1320a–7b(b)(1). *See Vernon*, 723 F.3d at 1252 ("The two subsections are effectively the two sides of the same illegal kickback coin: subsection (b)(1) criminalizes the soliciting or receiving of the kickback and subsection (b)(2) criminalizes the offering or paying of the kickback."). Thus, by the Government's logic, Shoemaker was also a "relevant decisionmaker" for the purposes of the second conspiracy alleged in Count Four, and acquittal was improper.

On this issue, the Government is doubly mistaken. First, the district court opinion is not internally inconsistent. Count Four alleges a conspiracy, which requires agreement, while Count Six charges Shoemaker only for the solicitation or receipt of a bribe. Thus, the district court could logically determine that sufficient evidence supported Shoemaker's conviction on Count Six, while also determining that evidence of his agreement with others was not sufficient under Count Four.

Second, for purposes of Count Six, the district court never held that Shoemaker was a "relevant decisionmaker" under Section (b)(1)—and rightly so. As discussed above, because this case does not implicate advertising services, and given the ample evidence in this case that Shoemaker received the kickbacks with the requisite criminal intent, *Miles* is inapplicable to the analysis of Shoemaker's criminal liability under either Count Four or Six. *See supra* Part II.C.1.

27

No. 12-60754
Consolidated with
No. 12-60791

Accordingly, because sufficient evidence supported all requisite elements of the conspiracies to provide kickbacks to Chandler and to Shoemaker, we hold that the district court erred in granting Garner's and Shoemaker's motions for judgment of acquittal on Count Four.

**D**

Count Five charged Garner with healthcare fraud in violation of 42 U.S.C. § 1320a–7b(b)(2)(B).   Count Five is the substantive counterpart to the first conspiracy charged in Count Four: That is, Garner allegedly realized the conspiracy by actually paying a kickback to Chandler.

The district court granted Garner's motion for judgment of acquittal on Count Five on the grounds that no evidence demonstrated that Chandler was a "relevant decisionmaker" under *Miles*.  *Miles*, 360 F.3d at 480.   For the reasons already discussed, the district court misinterpreted *Miles*.  *See supra* Part II.C.1.  Here, sufficient evidence established that Garner made payments with culpable intent to induce a "recommend[ation]."   42 U.S.C. § 1320a–7b(b)(2)(B).   For other reasons previously discussed, *see supra* Part II.B, the evidence of Garner's *mens rea*—that he acted "knowingly and willfully"—was sufficient to sustain his conviction.  *Id.*

Thus, the district court erred in granting a judgment of acquittal to Garner on Count Five.

**III**

The Government further contends that the district court erred in granting a new trial to Garner on Counts One, Two, Four, and Five, and to Shoemaker on Counts One, Three, and Four.  Except for Shoemaker's motion

No. 12-60754
Consolidated with
No. 12-60791

on Count Three,[24] these motions were granted in the alternative, such that even if the judgments of acquittal were vacated on appeal, Garner and Shoemaker would receive new trials.

We review a district court's grant of a new trial for abuse of discretion. *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999). A district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The "interest of justice" may take into account "the trial judge's evaluation of witnesses and weighing of the evidence." *United States v. Wall*, 389 F.3d 457, 465–66 (5th Cir. 2004). However, the trial judge "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005) (citation omitted). Rather, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* A district court is "powerless to order a new trial except on the motion of the defendant." *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979). Moreover, "a district court does not have the authority to grant a motion for a new trial under Rule 33 on a basis not raised by the defendant." *United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007) (holding that district court abused discretion in granting new trial on basis of prosecutor's improper argument, where issue was mentioned only in passing in defendant's motion).

The district court granted Garner's and Shoemaker's motions for new trial on Counts One, Two, and Three for the reason that the jury's lack of

---

[24] Shoemaker was not granted a judgment of acquittal on Count Three because the district court found that as CEO, he was an "agent" of TLMC under 18 U.S.C. § 666. Nonetheless, the district court granted his motion for a new trial on Count Three due to insufficient jury instructions, as discussed below.

No. 12-60754
Consolidated with
No. 12-60791

sufficient instruction on the meaning of "agent" under 18 U.S.C. § 666 and *Phillips* was prejudicial.[25]  However, the "agent" issue was not raised by either Garner or Shoemaker in their Rule 33 motions for new trial.  Because the district court has no power to grant a new trial under Rule 33 "on a basis not raised by the defendant," the district court abused its discretion in granting a new trial on these grounds.  *Nguyen*, 507 F.3d at 839.

As for Counts Four and Five, the district court granted Garner's and Shoemaker's motions for new trial on the basis that *Miles* required a jury instruction that Chandler "had authority as a relevant decision maker" to give business to Garner's company.  But as explained above, this proposed instruction derives from an incorrect understanding of *Miles*.  *See supra* Part II.C.1.  Because the jury instructions adequately explained all requisite elements for liability under 42 U.S.C. § 1320a–7b(b)(2)(B),[26] and because the evidence did not "preponderate heavily against the verdict," *Arnold*, 416 F.3d at 360, the "interest of justice" does not require a new trial, Fed. R. Crim. P.

---

[25] The relevant portions of Jury Instruction No. D-16 on Count Two explained that the Government had to prove beyond a reasonable doubt "[t]hat the recipient or intended recipient of something of value that is, Mr. David Chandler, was an agent of a state or local government, as charged" and that "Lee Garner acted corruptly in offering a payment to David Chandler in exchange for David Chandler using his influence as an agent of a subdivision of the State government and Tri-Lakes to direct Tri-Lakes' business to Guardian Angel and On-Call Staffing . . . ."

[26] Jury Instruction No. D-19 on Count Five explained that the Government had to prove beyond a reasonable doubt "1) that Lee Garner knowingly and willfully made payments or offered to make payments to David Chandler; 2) for the purpose of inducing David Chandler; 3) to recommend to Ray Shoemaker that Tri-Lakes purchase services from Guardian Angel and On-Call Staffing; 4) that could be paid for by a Federal healthcare program."

No. 12-60754
Consolidated with
No. 12-60791

33(a). Thus, the district court abused its discretion in granting Garner's and Shoemaker's motions for new trial on Counts Four and Five.[27]

We therefore vacate all of the district court's grants of new trials to Garner and Shoemaker.

**IV**

Shoemaker appeals his remaining convictions on various grounds.

As to his conviction on Count Twelve for embezzlement in violation of 18 U.S.C. § 666, Shoemaker contends that the supporting evidence is insufficient, that the admission of testimony about civil violations and jury instructions equating deliberate ignorance with knowledge warrant a new trial, that the same jury instructions impermissibly amended the indictment, and that cumulative error requires a new trial. He submits that his convictions on Counts Eight through Eleven for conspiring to make and for making false statements to the USDA in violation of 18 U.S.C. §§ 371 and 1014, respectively, were supported by insufficient evidence and that the admission of evidence of civil violations requires a new trial. Likewise, he challenges the sufficiency of evidence supporting his conviction on Count Seven for making false statements to the FBI in violation of 18 U.S.C. § 1001, and his convictions on Counts Three and Six for soliciting and receiving bribes and kickbacks in violation of 18 U.S.C. § 666 and 42 U.S.C. § 1320a–7b, respectively. He further contends that the district court's denying his motion for judgment of acquittal on Count Six while granting his co-defendant's motion on a separate count constituted a

---

[27] Moreover, Garner did not raise the *Miles* issue in his motion for new trial (which incorporated additional arguments made in his motion for acquittal). Thus, for the independent reason that the district court had no power to grant a new trial "on a basis not raised by the defendant," granting a new trial to Garner on Counts Four and Five was error. *Nguyen*, 507 F.3d at 839.

31

No. 12-60754
Consolidated with
No. 12-60791

retroactive misjoinder because the evidence underlying both convictions was identical. Lastly, Shoemaker submits that the Government prejudiced his defense by failing to comply with *Brady v. Maryland*, 373 U.S. 83 (1963), and that the district court erred in determining his total offense level.

We have considered the parties' submissions and reviewed the record. Because we conclude that sufficient evidence supported Shoemaker's remaining convictions, and otherwise find no errors warranting reversal or a new trial, we affirm Shoemaker's convictions on Counts Three and Counts Six through Twelve.

## V

For the foregoing reasons, we VACATE the district court's grants of Garner's and Shoemaker's motions for judgment of acquittal and new trial, AFFIRM Shoemaker's other convictions, and REMAND for reinstatement of the jury verdict and for sentencing.