# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-20323

United States Court of Appeals
Fif h Circuit

**FILED**

November 7, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

EARNEST GIBSON, III; EARNEST GIBSON, IV,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before WIENER, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

"The trouble with conspiracies is that they rot internally."[1] According to the government's cooperating witnesses, the appellants—Earnest Gibson, III (Gibson III) and his son, Earnest Gibson, IV (Gibson IV)—participated in three: one to defraud Medicare, another to pay unlawful kickbacks, and a third to launder money. A jury convicted the Gibsons for each, plus several substantive kickback counts. On appeal, the Gibsons advance sufficiency challenges and assert that the health care fraud and money laundering conspiracies merged.

---

[1] Robert A. Heinlein, *The Moon is a Harsh Mistress* 76 (1966).

No. 15-20323

For his part, Gibson III argues that the district court infringed his constitutional rights by limiting one of his cross-examinations and by admitting a co-conspirator's confession, in violation of the *Bruton* doctrine. He also faults the trial court for giving the jury "deliberate ignorance" instructions on charges requiring specific intent. In turn, Gibson IV posits that the district court imposed too much restitution. Both appellants also invoke the cumulative error doctrine, claiming that the trial court's alleged mistakes infected the verdict. We find no reversible error and thus affirm.

## I.

This case presents another instance of Medicare fraud involving Partial Hospitalization Programs (PHPs). PHPs are outpatient programs designed to provide daily, intensive treatment for patients suffering from an "acute exacerbation" of a chronic mental disorder. Houston's Riverside General Hospital (Riverside) ran PHPs, both onsite and at satellite locations. Riverside's Chief Executive Officer, president, and administrator was Gibson III. His son, Gibson IV, operated an affiliated, offsite PHP, Devotions Care Solutions (Devotions).

In 2006, Medicare approved Riverside and its PHPs to submit reimbursement claims. Not surprisingly, a PHP costs more to operate than does a standard outpatient service. So it is also unsurprising that Medicare attached several strings to its PHP coverage.

One condition was patient eligibility. To bill Medicare for PHP services, a physician needed to certify that the Medicare beneficiary required treatment comparable with inpatient care. Naturally, a patient must have had "the ca-

2

pacity for active participation in all phases of the multidisciplinary and multi-modal program." Patients diagnosed with Alzheimer's or dementia, for example, would raise "red flag[s]" for Medicare.

The type of treatment mattered, too. A doctor must have certified that the PHP services would be "furnished while the individual [wa]s under the care of a physician" according to "an individualized written plan of care." Expressly excluded from Medicare coverage were, to name a few: "services to hospital inpatients and meals, self-administered medications and transportation"; "custodial or respite care"; "programs attempting to maintain psychiatric wellness"; "daycare programs for the chronically mentally ill"; and "services to a nursing facility resident that should be expected to be provided by the nursing facility staff." And if a hospital operated an offsite PHP—like Gibson IV's Devotions—treatment must have occurred under a licensed physician's "direct supervision." That meant the physician had to be "physically present" in the office suite housing the offsite PHP and "immediately available to provide assistance and direction throughout the time the employee is performing services."

Medicare also imposed timing requirements. A PHP patient needed to receive "active treatment" at least four days and twenty hours a week. And if a patient's condition "improve[d] or stabilize[d]," or if she could not benefit from "the intensive multimodal treatment available in the PHP," the PHP had to discharge her.

In 2006—and again in 2008, 2009, and 2011—Gibson III certified that Riverside's PHPs complied with "the laws, regulations and program instructions of the Medicare program." That, according to the government, turned out to be false. As the prosecutors put it, Riverside submitted on behalf of its PHPs

No. 15-20323

$160,336,451.90 in Medicare bills, and Medicare paid $46,753,180.04 before realizing it had been swindled.

On October 1, 2012, a grand jury in the Southern District of Texas indicted Gibson III, Gibson IV, and five others on thirteen counts, alleging various illegal schemes relating to Riverside PHPs. Facing the prospect of a jury trial, three defendants pleaded guilty. Two of them turned government's witnesses to testify against the Gibsons. By contrast, the Gibsons put the government to its burden.

Thus ensued a month-long trial. On October 20, 2014, a jury convicted Gibson III of conspiracy to commit healthcare fraud (Count 1), conspiracy to defraud the government and violate the Anti-Kickback Statute (AKS) (Count 2), seven substantive kickback offenses (Counts 3, 4, 5, 7, 9, 11 & 12), and conspiracy to commit money laundering promotion (Count 13).[2] The jury found Gibson IV guilty on each conspiracy charge (Counts 1, 2 & 13) and two substantive kickback offenses (Counts 11 & 12). Soon after, the district court sentenced Gibson III to 540 months' imprisonment and $46,753,180.04 in restitution. On Gibson IV the court imposed a 240-month prison term and $7,518,480.11 in restitution.

The Gibsons now assert nearly a dozen grounds for reversal.[3] None is persuasive.

## II.

We first consider whether the government submitted enough evidence to support the convictions. It did.

---

[2] The jury acquitted Gibson III on two substantive kickback charges, Counts 6 and 8. Count 10 was not at issue because it pertained only to one of the defendants who pleaded guilty.

[3] Both Gibsons have court-appointed attorneys. Before they obtained counsel, however, the Gibsons filed identical pro se motions to vacate their convictions. Assuming those

No. 15-20323

We take a de novo look at preserved sufficiency-of-the-evidence challenges. *United States v. Davis*, 735 F.3d 194, 198 (5th Cir. 2013). In doing so, we "review[] the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc). To suffice, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt[.]" *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quotation marks omitted). "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Id.* (quotation marks omitted). Even "the 'uncorroborated testimony of an accomplice or of someone making a plea bargain with the government' can support a conviction." *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017) (quoting *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014)).

## A.

A rational juror could find beyond a reasonable doubt that the Gibsons joined a health care fraud conspiracy (Count 1).

That crime comprises three elements: that (1) two or more persons made an agreement to commit health care fraud;[4] (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement

---

pro se motions are properly before us, they must be denied for the same reasons stated in this opinion.

[4] A person commits health care fraud in violation of 18 U.S.C. § 1347 by

knowingly and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

willfully, that is, with the intent to further the unlawful purpose. *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (quotation marks omitted). The jury need not find that the defendants "actually submitted the fraudulent documentation" to convict. *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014). In fact, the government need not show an overt act at all. *United States v. Njoku*, 737 F.3d 55, 67–68 (5th Cir. 2013). Nor must the prosecution show direct evidence of the conspiracy; "each element may be inferred from circumstantial evidence." *Willett*, 751 F.3d at 339 (quotation marks omitted). The illegal agreement may even be "silent and informal." *Id.* (quotation marks omitted). Still, a conviction must rest on sturdier legs than mere inference or supposition. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("[T]he government must do more than pile inference upon inference upon which to base a conspiracy charge." (quotation marks omitted)).

The government equipped the jury with enough evidence to conclude that the Gibsons unlawfully agreed to bill Medicare for unnecessary or unperformed services. For starters, the evidence against Gibson IV was as robust as it was simple. Take, for instance, the testimony of a behavioral technician who said Gibson IV instructed her to bill Medicare for unperformed services. Or the FBI agent who reviewed with the jury Riverside's internal compliance memoranda—incriminating documents showing that Gibson IV's PHP billed Medicare for never-performed treatment.

The evidence against Gibson III was similarly powerful. One PHP supervisor explained that he and Gibson III entered two contracts; one to pay the supervisor a percentage of Riverside's Medicare returns, and another to pay him $16,000 each month he referred 26 to 30 Medicare patients to a Riverside

---

*United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (quotation marks omitted).

PHP. The supervisor further admitted to paying marketers to meet his patient quota. What is more, he testified that Gibson III tracked those marketers' locations with a spreadsheet. According to the supervisor, Gibson III also talked about the "census"—the number of billable patients in a PHP—"all the time." The instructions were to "keep [the] census up," else Gibson III would terminate their contract. And this was no rare threat. The boss sent several letters warning the supervisor to bring in more patients to increase Riverside's "market share."

That supervisor was one of many informants who implicated Gibson III. A patient recruiter explained how Gibson III skirted Medicare rules by directing PHPs to keep beneficiaries for 90 days, put them in onsite "aftercare" programs to watch television for a few weeks, and then readmit those patients to avoid losing them to competitor-PHPs. A behavioral-health technician testified that the PHPs often admitted ineligible patients and rendered bogus treatment. The jury also learned that Gibson III heard complaints that the only on-duty psychiatrist was often absent and failed to fill out necessary patient forms. But those complaints fell on deaf ears and into obstructive hands. When an exasperated PHP supervisor finally replaced that psychiatrist with someone willing to do the work, Gibson III pulled rank and reinstated the absentee doctor.[5]

The testimony unveiled similar shenanigans at other Riverside PHPs. One worker revealed that his PHP's assigned psychiatrist showed up only once a week. Another testified that some patients waited a fortnight in a cafeteria before seeing a doctor. And the patients themselves grew impatient; they consistently complained that they couldn't see a doctor. Still more evidence

---

[5] A jury in a separate trial convicted that doctor of Medicare and Medicaid fraud. We later upheld her convictions and sentence. *See United States v. Iglehart*, 687 F. App'x 333 (5th Cir. 2017) (per curiam).

showed that Devotions violated Medicare rules by permitting nurse practitioners to admit and discharge patients.

Even Gibson III's own testimony supported the verdict. He admitted he knew that Medicare required a psychiatrist to be present full-time at every PHP, and that one psychiatrist was assigned to be at two places at once. He conceded he also knew Medicare had reimbursed Riverside for "false claims," but failed to alert Medicare or fire the people responsible. He further acknowledged he reviewed compliance memoranda and internal audits exposing fraud, but the conduct continued. Faced with so much evidence, a rational juror could have found that Gibson III declined to act because he was part of the conspiracy. *See, e.g.*, *Imo*, 739 F.3d at 236–37 (inferring a defendant's (1) knowledge of a health care fraud conspiracy from his proximity to unlawful acts and (2) complicity from the continued unlawful activities); *Willett*, 751 F.3d at 340 (inferring knowledge of a health care fraud conspiracy from the defendant's "proximity to the fraudulent activities" and frequent meetings with his alleged coconspirator).

To be sure, throughout trial Gibson III professed ignorance and stressed his steps to stem misconduct. He also shifted blame to supposedly rogue subordinates. A rational juror, however, could have disbelieved his account and credited instead the cooperating co-conspirators'. And a successful sufficiency challenge cannot hinge on such credibility calls. *United States v. Sanjar*, 853 F.3d 190, 212 (5th Cir. 2017) ("To the extent [appellants] identify inconsistencies in the . . . testimony, that credibility determination is for the jury to make."), *cert. denied*, No. 17-5340, 2017 WL 3184826 (U.S. Oct. 2, 2017); *see also United States v. Burns*, 526 F.3d 852, 860 (5th Cir. 2008) ("[I]t is up to the

No. 15-20323

jury to judge the credibility of witnesses who receive favorable treatment from the Government to testify.").

Put succinctly, a juror could rationally draw from the evidence a simple conclusion: that the Gibsons knew of and willfully joined a conspiracy to submit false PHP claims and pilfer Medicare money.

**B.**

A reasonable juror could also find that the Gibsons conspired to violate—and actually violated—the AKS.

The statute provides that

> whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . . shall be guilty of a felony . . . .

42 U.S.C. § 1320a-7b(b)(2)(A). In other words, the AKS "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). To prove an AKS conspiracy, the government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *Njoku*, 737 F.3d at 64 (quotation marks omitted); *see also* 18 U.S.C. § 371. The defendant must have "acted willfully, that is, with the specific intent to do something the law forbids." *Miles*, 360 F.3d at 479 (quotation marks omitted).

9

Here, too, multiple witnesses exposed Gibson IV at trial, testifying that through February 2012 he agreed to pay them for referrals. One recruiter described it as an "illegal deal" involving cash paid "under the table."

Some evidence was indeed devastating. A recruiter described how Gibson IV twice paid $1,000 in cash, in a restaurant bathroom, after circling the block to ensure no one had followed them. That first bathroom handoff, according to the recruiter, was for "partial payment of the patients that was [sic] going to Devotions." As for the second payment, Gibson IV said that "he had to get it approved from his pops" and "was going to the bank to get it," and that "he didn't know how much his pops was going to approve, but he was going to do something." Gibson IV later agreed to pay $50 per week if that recruiter kept bringing patients to Devotions.

Even Riverside's security smelled something fishy. A guard testified that a group-home owner once visited to complain that Gibson IV "wanted the [owner's] patients to come to the [Devotions] program, but he didn't want to pay." So the guard paged Gibson IV, who appeared in the lobby and handed the owner a white envelope. Given all this, a rational juror could conclude beyond a reasonable doubt that Gibson IV conspired to pay kickbacks.

So, too, for Gibson III. Start with Gibson IV's references to his "pops"; that supports a finding that Gibson III was the scheme's knowing and willful guarantor. Consider also the familial link between Gibson III and other relevant players—including his son, Gibson IV, and daughter-in-law, a hospital representative who coordinated with a recruiter to hide illicit, per-patient payments—which is circumstantial evidence of Gibson III's role in the conspiracy. *See Willett*, 751 F.3d at 340 ("[W]hen inferences drawn from the existence of a family relationship or mere knowing presence are combined with other circum-

stantial evidence, there may be sufficient evidence to support a conspiracy con-viction" (quotation marks and citation omitted)). Circumstantial evidence is also shown by Gibson III's position of authority at Riverside. *See id.* at 340–41.

Circumstantial evidence aside, the jury heard several cooperating wit-nesses identify Gibson III as a kickback conspirator. One testified that Gibson III was part of the recruiting racket. That witness said that he thrice met Gib-son III to discuss the kickback scheme. During an October 2010 meeting at a Riverside office, for example, Gibson IV introduced the recruiter as Gibson IV's "business partner," and Gibson III heard a proposal to recruit 350 to 500 pa-tients to a Riverside PHP. Responded Gibson III: "I don't want to know what you-all are doing or how you-all doing [sic] it, but, you know, because it's a lot of patients, you-all be careful." He later recommended that his son and the recruiter create an artificial entity so that Riverside could cut them checks. Gibson IV and the recruiter heeded that advice to avoid raising "flags" when Riverside paid for patients.

These were not isolated incidents. Another Riverside employee testified that Gibson IV instructed her to go near Gibson III's office to pick up "an en-velope of cash" to pay recruiters. Other recruiters admitted to receiving pay-ments per patient. The jury therefore had sufficient evidence rationally to find Gibson III guilty of a kickback conspiracy. *See Sanjar*, 853 F.3d at 212 (infer-ring knowledge and willfulness where defendants "meticulously monitored pa-tient referrals, tracking patients, their referrers, and the billings on their claims" and paid "patients in cash, delivered in envelopes").

But the government proved more than just a conspiracy. It matched the recruiters' testimony with specific checks bearing Gibson III's signature. Thus, under the *Pinkerton* doctrine, a juror could rationally convict the Gibsons on the substantive AKS counts. *See Pinkerton v. United States*, 328 U.S. 640, 645–

48 (1946). This doctrine holds the Gibsons responsible for foreseeable kick-backs paid while the Gibsons were members of the kickback conspiracy. *See id.* Here, the government proved specific kickbacks that were unquestionably fore-seeable to the Gibsons. *E.g.*, *Sanjar*, 853 F.3d at 209 ("[H]ow could the payment of kickbacks not be foreseeable to a participant in a kickback conspiracy?"); *United States v. Barson*, 845 F.3d 159, 165 (5th Cir. 2016) (upholding substan-tive health care fraud convictions because "the jury was entitled to convict De-fendants pursuant to the *Pinkerton* doctrine" and "the evidence was sufficient to convict Defendants on [a health care fraud] conspiracy count").

Seeking to avoid this conclusion, the Gibsons protest that the govern-ment failed to show either that (1) money flowed to a "relevant decision maker for sending patients" to the PHPs, or (2) the payments "influenced the inde-pendent medical judgment of a doctor concerning a patient's care." But the AKS has no "relevant decision maker" or "medical judgment" requirement. *Shoemaker*, 746 F.3d at 628–29. The statute criminalizes payments made to "any person" with the requisite intent. *Id.*; 42 U.S.C. § 1320a-7b(b)(2)(A).

Viewed in the light most favorable to the verdict, the trial evidence was adequate to prove beyond a reasonable doubt that the Gibsons knowingly and willfully entered in an expansive kickback conspiracy, intending to induce re-cruiters to refer Medicare beneficiaries to Riverside's PHPs. Numerous recruit-

No. 15-20323

ers confirmed that is precisely what happened. Thus, under *Pinkerton*, the Gibsons were properly held accountable for substantive AKS violations. These convictions stand.

## C.

Next, we consider the sufficiency challenge on the convictions for conspiracy to commit money laundering promotion. The Gibsons' arguments fail on this front too.[6]

It is unlawful to "conspire[] to commit any offense defined in [18 U.S.C. § 1956]." 18 U.S.C. § 1956(h). Count 13 alleges that the Gibsons conspired to violate the money laundering *promotion* provision, which prohibits persons "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" from "conduct[ing] or attempt[ing] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the *intent to promote* the carrying on of specified unlawful activity[.]" § 1956(a)(1)(A)(i) (emphasis added); *see also United States v. Stanford*, 823 F.3d 814, 849 (5th Cir. 2016). Like a health care fraud conspiracy, this crime needs no overt act. *Whitfield v. United States*, 543 U.S. 209, 219 (2005).

The Gibsons muster a three-pronged attack. First, they insist that the government failed to identify any money actually derived from health care fraud. Second, the Gibsons believe the government should have distinguished whether, from September 2008 to May 20, 2009, the money laundering involved "receipts" or "profits" of a predicate Medicare fraud. Last, the Gibsons maintain that the government failed to establish their criminal intent because

---

[6] The government contends that the Gibsons failed to preserve their sufficiency arguments on this count. We need not wrestle with that question because the evidence was sufficient even under a de novo standard.

perhaps the Gibsons used Medicare funds to cover legitimate business expenses.

These claims fail. To begin, the Gibsons' arguments mistakenly seek proof of an overt act in furtherance of the conspiracy. But a conspiracy to commit money laundering promotion requires no such act. *Id.*

Nevertheless, the first argument fails for an independent reason: a rational juror could have concluded beyond a reasonable doubt that the Gibsons knowingly dealt in proceeds of unlawful activity. The government proved that Medicare paid millions in Riverside's claims for PHP services, and that Riverside's claims were fraudulent. Recall that Gibson III himself admitted that he knew some of the claims were false. And a forensic accountant testified that once Medicare paid Riverside, Gibson III transferred some of those funds from Riverside's bank account to the Devotions bank account, titled "Earnest Gibson IV DBA Devotions Care Solutions." The government then traced how, from 2008 until June 2012, Gibson IV withdrew over $715,000 in cash from that Devotions account and paid over $80,000 in checks to admitted recruiters. A rational deduction from that evidence is that the Gibsons both (1) knew they had fraudulently received Medicare funds, and (2) agreed to continue that fraud by using *some* of those funds as kickbacks to harvest more patients and generate new fraudulent claims.

The Gibsons' second argument—that the government should have distinguished between "receipts" and "profits" from September 2008 to May 20, 2009—also founders. Here, the Gibsons rely on a splintered Supreme Court opinion that attempted to determine whether the term, "proceeds," in a prior version of the money laundering statute meant "receipts" or "profits." *See United States v. Santos*, 553 U.S. 507 (2008). But Congress effectively overruled *Santos* by amending the statute to define "proceeds" more broadly, and that law took effect on May 20, 2009. *See* Fraud Enforcement and Regulatory

Act of 2009 (FERA), Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618 (2009), *codified at* 18 U.S.C. § 1956(c)(9) ("[T]he term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."). No doubt the jury saw enough evidence to find that the Gibsons participated in a money laundering conspiracy *after* May 20, 2009. After all, Riverside's PHPs increased their Medicare bills and payments year over year until June 2012. *Santos*, then, is of no moment.[7]

The Gibsons' last point is similarly unpersuasive. Relying on our *Miles* decision, the Gibsons urge us to overturn their convictions because the government failed to disprove that they used Medicare funds for legitimate business expenses. *See* 360 F.3d at 479 ("The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture."). Again, this argument overlooks that the convictions are for *conspiracy* to commit money laundering promotion—so the government bore no burden to identify *any* financial transaction, let alone distinguish between legitimate and unlawful ones. *See Whitfield*, 543 U.S. at 219 (holding that money laundering conspiracy requires no overt act). In any event, the convictions satisfy *Miles* because the indictment alleged (and the evidence showed) that the Gibsons' money laundering plan contemplated transactions designed to foster further fraud. *See, e.g., United States v. Valdez*, 726 F.3d 684, 691 (5th Cir. 2013) (upholding money laundering promotion convictions and rejecting the defendants' *Miles* arguments

---

[7] The Gibsons do not address whether (or how) *Santos* affects their restitution obligations.

where the evidence showed a "clear nexus between the payments and [an underlying] fraud" and suggested the transactions were "payments to secure loyalty or cooperation in [a] fraudulent scheme"). Viewing the evidence of kickbacks outlined above and the year-over-year growth in Riverside's Medicare claims and reimbursements, a juror could rationally conclude that the Gibsons agreed to "funnel ill-gotten gains directly back into the criminal venture." *Miles*, 360 F.3d at 479.

The evidence supporting Count 13 was sufficient.

## III.

The Gibsons also challenge the money laundering promotion conspiracy count because, as they see it, that crime merged with the health care fraud conspiracy. But there was no merger. The two counts are distinct *conspiracies*, neither of which had as an element any overt act that could have overlapped to create a merger problem. Rather, the convictions depend on different facts and agreements.

We turn first to the standard of review. The Gibsons concede their failure to raise a merger argument below. They must therefore establish plain error—no small task, as they must show a clear and obvious error affecting their substantial rights. *United States v. Scott*, 821 F.3d 562, 570 (5th Cir. 2016). And even if they vault those hurdles, we fix the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United*

No. 15-20323

*States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc) (altera-tions and quotation marks omitted).[8]

In the money laundering context, the salient "merger" question is "whether the money laundering crime is based upon the same or continuing conduct of the underlying predicate crime, or whether the crimes are separate and based upon separate conduct." *United States v. Kennedy*, 707 F.3d 558, 565 (5th Cir. 2013). Merger, then,

> may be proved in two ways: (1) a defendant may demonstrate the underlying unlawful activity was not complete at the time the al-leged money laundering occurred; or (2) a defendant may show the transaction upon which the money laundering count is based was not a payment from profits of the underlying crime made in sup-port of new crimes, but, instead, was a payment from gross receipts of the previously committed crime made to cover the costs of that same crime.

*Id.*

We see no plain error here because the jury convicted the Gibsons of con-ceptually and temporally distinct *agreements*. The charged health care fraud conspiracy was a pact to perpetrate Medicare fraud. To convict, the jury must have found that the Gibsons joined that agreement knowing and intending to further its purpose. *See Willett*, 751 F.3d at 339. By contrast, the alleged money laundering promotion conspiracy was a compact to conduct a financial trans-action involving the *proceeds* of health care fraud with the intent to promote or further unlawful activity—an agreement the Gibsons must have joined know-ingly and intending to further its purpose. *See United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013). Put another way, Count 1 targeted a conspiracy

---

[8] We do not address whether the Gibsons forfeited their merger argument by failing to raise it pretrial. *Cf. Njoku*, 737 F.3d at 67 (holding that failure to raise a multiplicity ob-jection pretrial forfeits that argument on appeal); *United States v. Dixon*, 273 F.3d 636, 642 (5th Cir. 2001) (same).

to submit false bills to Medicare, while Count 13 alleged a conspiracy to use fraudulently obtained money with the goal of submitting *subsequent* false bills.

Also important is that neither crime needed an overt act. Because the Gibsons' convictions do not rest on any actual money laundering, we see no clear and obvious risk that "the underlying unlawful activity was not complete at the time the alleged money laundering occurred" or that "the transaction upon which the money laundering count is based . . . was a payment from gross receipts of the previously committed crime made to cover the costs of that same crime." *Kennedy*, 707 F.3d at 565. By charging the Gibsons with these two in-choate crimes, the government did not have to show that "money laundering occurred" or that the Gibsons made any actual "transaction" or "payment." *Id.*; *cf. Iannelli v. United States*, 420 U.S. 770, 777–78 (1975) (noting that because "a conspiracy poses distinct dangers quite apart from those of the substantive offense," a "conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act." (citation omitted)); *Sanjar*, 853 F.3d at 202 (finding no Double Jeopardy problem where an indictment charged defendants with both a Medicare fraud conspiracy under 18 U.S.C. §§ 1347, 1349 and a conspiracy to violate the AKS under 18 U.S.C. § 371); *United States v. Cloud*, 680 F.3d 396, 408 (4th Cir. 2012) (finding no mer-ger problem between money laundering conspiracy conviction and a mortgage fraud conspiracy conviction because the former "was not tied to any specific payment to a recruiter, buyer, or coconspirator").[9] Because these distinct agreements did not clearly and obviously merge, we find no plain error.

---

[9] Gibson IV argues for the first time in a reply brief that his money laundering con-spiracy in Count 13 merged with his substantive AKS convictions on Counts 11 and 12. This eleventh-hour argument is waived. *United States v. Myers*, 772 F.3d 213, 218 (5th Cir. 2014) ("We generally do not consider arguments made for the first time in a reply brief . . . ."); *Stanford*, 823 F.3d at 851 n.54 ("Stanford makes this argument for the first time in his reply brief, so it is waived."). Yet, were we to exercise our "discretion to decide legal issues that

No. 15-20323

## IV.

Nor do we see reversible error in the district court's minor limitation of one cross-examination.

While cross-examining a former Riverside employee, Gibson III sought to establish that he had "made clear" to the employee that "it was against the law to pay for a patient or to pay per patient." The district court sustained the government's hearsay objection. *See* Fed. R. Evid. 801, 802. Gibson III countered, unsuccessfully, that the government opened the door by exploring on direct other statements Gibson III made to the witness during the same conversation. Despite sustaining the objection, the district court still permitted Gibson III to establish on cross that (1) Riverside had an official a policy to comply with Medicare rules, (2) Gibson III implemented that policy, and (3) Gibson III never orally contradicted the policy.

We review for plain error because Gibson III switched tacks between trial and appeal. *See* Fed. R. Evid. 103(a)(1)(B); *United States v. Green*, 324 F.3d 375, 381 (5th Cir. 2003). Whereas he previously insisted this evidence was admissible because the government had "opened the door" to it, he now invokes his constitutional right to present a defense and Rule 803's state-of-mind exception to the hearsay bar. *See* U.S. Const. amends. V, VI; Fed. R. Evid. 803(3).

The Constitution guarantees defendants the right "to present a complete defense," *Njoku*, 737 F.3d at 75, and the "*opportunity*" to conduct effective

---

[we]re not timely raised," *Myers*, 772 F.3d at 218, we would find no plain error. Counts 11, 12, and 13 reflect different crimes. The alleged conspiracy count requires proof of an *agreement* to use *proceeds of fraud* to promote *further fraud*; this crime is untethered to an actual payment or kickback. *See Njoku*, 737 F.3d at 67. By contrast, the kickback offenses in Counts 11 and 12 require proof that the Gibsons knowingly and willfully *gave or received a benefit* for referring a party to a health care provider for services paid for by a federal health care program. *Sanjar*, 853 F.3d at 211. The jury must have found an actual payment, but not necessarily fraud. *See id.* ("[A] kickback violation can occur without any fraudulent billing."). Thus, we do not find a clear and obvious merger here. *See Scott*, 821 F.3d at 570.

cross-examinations, *Delaware v. Fensterer*, 474 U.S. 15, 19–20 (1985) (per curiam). Of course, the "right to present a complete defense may be violated by 'evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.'" *Njoku*, 737 F.3d at 75 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). To establish a constitutionally infirm limitation on his cross-examination rights, Gibson III must show "that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *United States v. Skelton*, 514 F.3d 433, 440 (5th Cir. 2008) (alterations and quotation marks omitted).

The district court committed no reversible error, constitutional or evidentiary. Gibson III did not suffer a constitutional deprivation because the court allowed him to ask whether the witness learned—during the same conversation at issue—that Gibson III set Riverside's policies and that "the policy was very clear . . . that Riverside General Hospital followed the law and the regulations with Medicare." Put differently, the district court permitted Gibson III to elicit essentially the same (if not better) facts as those he originally proffered. *See Sanjar*, 853 F.3d at 204–05 (supposed constitutional error in limiting cross-examination was harmless where the district court permitted some questioning into the desired testimony). There was no constitutional error, let alone a harmful one.

Neither does the court's evidentiary ruling require reversal. To be sure, we wonder whether Gibson III's out-of-court statement—that "it was against the law to pay for a patient or to pay per patient"—is indeed hearsay. It is unclear what truth value this statement could carry when everyone agreed that the AKS indeed forbids such payments. *See* Fed. R. Evid. 801, 802; 42

No. 15-20323

U.S.C. § 1320a-7b(b). But as we explained above, any evidentiary error was harmless.[10]

## V.

We also hold that the district court properly admitted a co-defendant's out-of-court confession over Gibson III's *Bruton* objection. *See Bruton v. United States*, 391 U.S. 123 (1968).[11]

The *Bruton* doctrine addresses the thorny Sixth Amendment problem where one defendant confesses out of court and incriminates a co-defendant without testifying at their joint trial. In its landmark opinion, the *Bruton* Court reversed a defendant's postal robbery conviction, *see* 18 U.S.C. § 2114, on Confrontation Clause grounds where his non-testifying co-defendant had made "powerfully incriminating" statements against the defendant in a pretrial confession, 391 U.S. at 135–36. At trial, a postal inspector testified that the declarant twice confessed—once to say that both the declarant and the defendant committed the robbery, and again to admit to having an "an accomplice he would not name[.]" *Id.* at 124. Though the trial judge instructed the jury to consider the confessions against only the declarant, the Supreme Court re-

---

[10] Gibson III argues in passing that the rule of completeness, Fed. R. Evid. 106, required the district court to admit Gibson III's unrecorded, oral statement. Not so. Rule 106 applies only to written and recorded statements. Fed. R. Evid. 106; *Sanjar*, 853 F.3d at 204.

Gibson III's brief also asserts (incorrectly) that the proffered statement was "Riverside did not pay for patients." Were that truly his statement, his state-of-mind argument would not establish plain error. Rule 803(3) permits a court to admit statements "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but *not* including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3) (emphasis added). The assertion, "Riverside did not pay," is not clearly a statement of motive, intent, or plan. Rather, it could just as easily be interpreted as the kind of statement of historical fact or belief that Rule 803(3) precludes.

[11] We review a preserved *Bruton* argument de novo and for harmless error. *United States v. Ramos-Cardenas*, 524 F.3d 600, 606 (5th Cir. 2008).

21

versed the conviction because there was a "substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt[.]" *Id.* at 126.

Nearly twenty years later the Supreme Court clarified. *Bruton*, the Court wrote, was a "narrow exception," one that did not preclude a trial court from admitting a confession that (1) had been redacted, (2) "was not incriminating on its face," and (3) "became [incriminating] only when linked with evidence introduced later at trial (the defendant's own testimony)." *Richardson v. Marsh*, 481 U.S. 200, 207–08 (1987). Eleven years passed before the Supreme Court again refined its *Bruton* rule. This time, in another redacted-confession case, the Court noted that "*Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference." *Gray v. Maryland*, 523 U.S. 185, 196 (1998). *Gray* held that a redacted confession was "facially incriminat[ing]" and offended *Bruton* if it included "statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* In finding a *Bruton* violation in Gray's trial, the Supreme Court also emphasized that the redacted confession had a "blank prominent on its face[.]" *Id.*

The Gibsons' case is closer to *Richardson* than it is to *Gray* or *Bruton*. At trial, the government called an FBI agent who testified that the Bureau twice interviewed the Gibsons' co-defendant, a patient recruiter and file auditor. According to the FBI agent, the co-defendant admitted that Riverside paid personal care homeowners to bring patients to Riverside, and that the co-defendant herself received checks from Riverside for patients who attended the hospital's PHPs. Those statements do not include a facial or "obvious" reference to Gibson III, *Gray*, 523 U.S. at 196, nor are they "powerfully incriminating," *Bru-*

22

*ton*, 391 U.S. at 135. They do not mention Gibson III at all; the confession identifies instead the Riverside Hospital system as a whole. The jury would still need to make several inferential leaps to conclude that Gibson III, as opposed to a host of other hospital workers, was behind the kickbacks. The testimony therefore did not run afoul of *Bruton*.

Our recent opinion in *United States v. Nanda*, 867 F.3d 522 (5th Cir. 2017) confirms our conclusion. There, like here, multiple defendants faced fraud conspiracy charges.[12] *Id.* at 526. There, like here, the defendants owned and operated an entity that made false representations to federal programs. *Id.* at 525–26. There, like here, one defendant confessed by accusing the *entity* of wrongdoing, without identifying specific individuals. *Id.* at 526–27. And there, like here, the non-confessing defendant argued that *Bruton* applied because "the reference to [the entity] was in effect a direct allusion to [the co-defendant] personally." *Id.* at 527. We rebuffed that argument in *Nanda* because the confessor's reference to the entity—there, a company called "Dibon"—did not "directly allude" to the objecting defendant, even if "the Government repeatedly stressed that [the co-defendants] were the central figures in Dibon's operation." *Id.* Rather, we found that "there were a number of other Dibon employees involved" in the unlawful scheme, so the confession "could have referred to any of them." *Id.* at 527–28. One need only substitute "Dibon" with "Riverside" to see how *Nanda*'s logic and holding obtain here.

Presented with nearly identical facts with those in *Nanda*, we follow that case's lead. There was no *Bruton* violation here.

---

[12] The crime at issue in *Nanda* was visa fraud in violation of 18 U.S.C. §§ 371 and 1546(a). *See* 867 F.3d at 526.

No. 15-20323

## VI.

Gibson III further avers that the district court erred by giving the jury a "deliberate ignorance" instruction. He raises three points: that the instruction (1) lacked factual support, (2) impermissibly lowered the government's burden to prove his specific intent, and (3) constructively amended the indictment. None prevails.

We review preserved charges of instructional error for abuse of discretion and harmlessness, and unpreserved ones for plain error. *Alaniz*, 726 F.3d at 611; *United States v. St. Junius*, 739 F.3d 193, 204 (5th Cir. 2013). Gibson III preserved his first argument, but not the second and third. *See* Fed. R. Crim. P. 30 ("A party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate."); *United States v. Daniels*, 252 F.3d 411, 414 n.8 (5th Cir. 2001) ("[T]his circuit applies plain error review to forfeited constructive amendment arguments."). But even viewing those latter arguments through an abuse-of-discretion lens, we see no reversible error.

"A deliberate ignorance instruction informs the jury that 'it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge.'" *United States v. Brown*, 871 F.3d 352, 355 (5th Cir. 2017) (quoting *United States v. Nguyen*, 493 F.3d 613, 618 (5th Cir. 2007)). Before turning to the merits, we must reemphasize that deliberate ignorance instructions should "rarely be given." *Id.* 356 (quoting *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015)). But in some cases it is appropriate. This is one such case.

Gibson III's first salvo is that the evidence did not justify the jury instruction. "[A] deliberate indifference instruction is warranted when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Brooks*, 681 F.3d 678, 701 (5th

24

Cir. 2012) (quotation marks omitted). Thus, "the evidence at trial must raise two inferences: (1) the defendant was subjectively aware of high probability of the existence of illegal conduct, and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.*; *see also Brown*, 871 F.3d at 355–56.

This case meets both prongs. At trial, Gibson III maintained he lacked guilty knowledge on all counts. *See Brown*, 871 F.3d at 356 ("A deliberate ignorance instruction is intended for this situation in which Brown knew it was highly likely that something illegal was afoot, but tried looking the other way while reaping the benefits of the likely criminal activity."). And ample evidence showed that Gibson III was subjectively aware of high probability of illegal conduct and that he purposely contrived to avoid learning details of the illegal conduct. Consider Gibson III's PHP visits that would have revealed obvious Medicare violations, or his statements that he did not "want to know" how his son and recruiters were getting patients, or the compliance memos and audits crossing his desk. Gibson III's factual attack falters because there was plenty of evidence from which to infer that Gibson III was deliberately ignorant.[13]

We are similarly unconvinced by Gibson III's next two arguments—that the instruction lowered the government's burden and constructively amended the indictment. The former is a nonstarter. *United States v. Vasquez*, 677 F.3d 685, 696 (5th Cir. 2012) ("The deliberate ignorance instruction does not lessen the government's burden to show, beyond a reasonable doubt, that the

---

[13] But even assuming, arguendo, the district court erred, the error was harmless. The same evidence of Gibson III's subjective awareness of a high risk of illegal conduct supports a reasonable inference that Gibson III actually knew of that conduct. *See United States v. Wofford*, 560 F.3d 341, 354 (5th Cir. 2009) ("The evidence supporting the inference that Wofford was subjectively aware that his conduct was unauthorized and illegal also supports the inference that he had actual knowledge."); *United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990) ("[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct.").

knowledge elements of the crimes have been satisfied." (quotation marks omitted)).[14] As is the latter. The jury charge did not tinker with the indictment because the district court tracked almost verbatim the Fifth Circuit Pattern Instruction, which we have affirmed time and again as a correct statement of the law. *Brooks*, 681 F.3d at 702–03; *see also Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754, 769–70 (2011); *United States v. Hunter*, 628 F. App'x 904, 906–07 (5th Cir. 2015) (per curiam). Equally telling is our repeated endorsement of deliberate ignorance instructions in fraud and conspiracy cases just like this one. *See, e.g.*, *Brown*, 871 F.3d at 355–56; *Sanjar*, 853 F.3d at 207; *Hunter*, 628 F. App'x at 906–07. This sensible approach squares with our conception of deliberate ignorance instructions as informing a jury "that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Brown*, 871 F.3d at 355 (quotation marks omitted).[15] Thus, the trial court did not err.

---

[14] Gibson III also attacks the *Pinkerton* instruction, but offers no authority to explain how that instruction lowered the government's burden of proof. This argument is therefore forfeited. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

　Nevertheless, the argument would also fail on the merits. Charitably construed, Gibson III's brief can be read to argue that *Pinkerton* is inappropriate where the counts of conviction "incorporate[] a specific intent requirement far more stringent than mere foreseeability." *United States v. Gonzales*, 841 F.3d 339, 351 (5th Cir. 2016) (quotation marks omitted). That argument ignores our caselaw. *See id.* at 352–53 (affirming a murder conviction based on *Pinkerton* liability). We have consistently upheld convictions for conspiracy and specific-intent crimes (like Gibson III's) where the jury heard both *Pinkerton* and deliberate ignorance instructions. *See, e.g.*, *Sanjar*, 853 F.3d at 208–09; *Barson*, 845 F.3d at 165.

[15] In challenging the deliberate ignorance instruction, Gibson III relies primarily on this circuit's decision in *United States v. Chen*, 913 F.2d 183 (5th Cir. 1990). There, we found a deliberate ignorance instruction improper for a charge of "knowingly maintaining a place . . . for the purpose of distributing and using a controlled substance" in violation of 21 U.S.C. § 856(a)(1). *Chen*, 913 F.2d at 186 (quotation marks and alterations omitted). Although at first blush *Chen* seems to lend Gibson III support, *Chen* itself eschewed a blanket rule and apparently limited its holding to 21 U.S.C. § 856(a)(1). *See* 913 F.2d at 192 n.11 (rejecting the "argument that th[e deliberate ignorance] instruction should be limited to offenses which only proscribe *knowing* conduct"). And we have since confirmed that *Chen* is limited to § 856(a)(1). *E.g.*, *United States v. Scott*, 159 F.3d 916, 923–24 & n.6 (5th Cir. 1998).

No. 15-20323

And even if it did, the evidence of Gibson III's actual knowledge rendered any error harmless. *Kuhrt*, 788 F.3d at 417 ("[T]he giving of the [deliberate ignorance] instruction is harmless where there is substantial evidence of actual knowledge."). In short, although the deliberate ignorance instruction should be infrequent, the district court spotted a proper case for it.[16]

## VII.

We also find no merit in Gibson IV's restitution objection. The gist of this argument is that the district court mistakenly based his $7,518,480.11 obligation on the Medicare payments that Devotions caused. In Gibson IV's view, the court should have used the amount of Medicare money Riverside transferred to Devotions. He also states in passing that the district court should have offset some amount because his PHP provided the occasional legitimate service to patients.

---

Gibson III also relies on *United States v. Kuhrt*, a 2015 wire fraud and conspiracy case where this court quoted *Chen* in *dicta*. *See* 788 F.3d at 417 ("Undoubtedly, the deliberate ignorance instruction is 'inappropriate for an offense which requires a specific purpose by the defendant.'" (quoting *Chen*, 913 F.2d at 190)). But *Kuhrt*'s holding did not offer *Chen* a strong lifeline. The *Kuhrt* court found there was only "arguabl[e] error" in giving a deliberate ignorance instruction where "[t]he government constructed its case on the premise that Appellants were criminally liable based upon their actual knowledge of the fraud and their efforts to further the fraud." *Id.* But then the opinion held that "[e]ven assuming arguendo that this was error," *id.*, the "testimony that Appellants were actual participants in the illegal activity" rendered the potential error "harmless," *id.* at 418. *Kuhrt*, then, was far from a full-throated endorsement of *Chen* and did not extend that case beyond the § 856(a)(1) context.

[16] Gibson III also notes as an aside that the district court erred by directing the deliberate ignorance exclusively to him, and not to his co-defendants. *See United States v. Bieganowski*, 313 F.3d 264, 290 (5th Cir. 2002). But we have recognized that, in some cases, "giving the [deliberate ignorance] instruction generally, without naming a specific defendant, may prejudice those co-defendants who do not merit the instruction" and that "the better approach" may be "to give the instruction and indicate that it may not apply to all of the defendants." *Id.* (quotation marks and citation omitted). In other words, whether to give the instruction generally or to just one defendant is largely a matter within the trial court's discretion. *See id.* Here, the facts supported the instruction against only Gibson III because his defense theory differed from his co-defendants': he argued that, as head of the hospital system, he was too far removed to know of any illegal activity. We therefore find no error. *See St. Junius*, 739 F.3d at 206 (finding no plain error in giving a deliberate ignorance instruction for only one defendant).

27

No. 15-20323

Gibson IV preserved his first argument, so we review the restitution order's legality de novo and its amount for abuse of discretion. *United States v. Benns*, 810 F.3d 327, 329 (5th Cir. 2016). He waived the second contention, however, by inadequately briefing it. *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010). True, Gibson IV's offset claim appears in his statement of issues, but he reprises it just once: a single sentence in a section devoted to a different argument. That is insufficient. *Id.*[17]

We reverse a restitution order "only when" a defendant shows it "probable that the [trial] court failed to consider a mandatory factor and the failure to consider the mandatory factor influenced the court." *United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008) (quoting *United States v. Reese*, 998 F.2d 1275, 1280–81 (5th Cir. 1993)). "We review the district court's factual findings for clear error," and "[w]e may affirm in the absence of express findings 'if the record provides an adequate basis to support the restitution order.'" *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (quoting *United States v. Blocker*, 104 F.3d 720, 737 (5th Cir. 1997)).

Gibson IV's argument—that he should pay restitution only for the Medicare funds Riverside transferred to his PHP—misapprehends governing law. As its name suggests, the Mandatory Victims Restitution Act *requires* a defendant convicted of "any offense committed by fraud or deceit" to pay restitution to the victim. 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The statute defines a "victim" as

---

[17] Had we reached this incipient argument on the merits, we would have found no abuse of discretion. The trial court, having presided over weeks of testimony, appropriately concluded that the fraud was so pervasive that Gibson IV should pay the full restitution amount. *See Sanjar*, 853 F.3d at 213 (upholding a district court's decision not to apply a restitution credit where "[t]he government presented ample evidence . . . showing [the] entire PHP practice was fraudulent" and the defendants "offered little to no concrete evidence to rebut that showing").

a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

§ 3663A(a)(2). Thus, where, as here, "a fraudulent scheme *is an element* of the conviction, the court may award restitution for actions pursuant to that scheme." *United States v. Maturin*, 488 F.3d 657, 661 (5th Cir. 2007) (quotation marks omitted). Most important, the statute measures restitution by the victim's losses, not the amount one guilty defendant transfers to another. 18 U.S.C. § 3664(f)(1)(A) ("The court shall order restitution to each victim in the full amount of each *victim's losses* as determined by the court . . . ." (emphasis added)). Whether Riverside transferred to Gibson IV all—or just some—of the Medicare losses he helped inflict is neither here nor there. The district court did not abuse its discretion.

## VIII.

The Gibsons' closing charge is that the district court made so many mistakes that their trial was fundamentally unfair. Under the "cumulative error doctrine," we would reverse a conviction "when an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial." *United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014) (quotation marks omitted). At most, however, the Gibsons may have identified a harmless hearsay mistake. The cumulative error doctrine thus does not apply; "there is nothing to accumulate." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc).

\*　\*　\*　\*　\*

29

No. 15-20323

For the reasons stated above, the Gibsons' convictions and sentences are AFFIRMED and the pro se motions to vacate are DENIED.