# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-20776

United States Court of Appeals
Fifth Circuit

**FILED**

July 12, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>       Plaintiff - Appellee

v.

ROBERT CRANE,

>       Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CR-600-7

Before KING, ELROD, and ENGELHARDT, Circuit Judges.

PER CURIAM:*

A jury convicted Robert Crane of conspiring to violate the Anti-Kickback Statute. Crane appeals, arguing that the evidence at trial was insufficient to support his conviction. For the following reasons, we AFFIRM.

## I.

Robert Crane worked as a patient recruiter, van driver, and psychiatric technician for Devotions Care Solutions ("Devotions"), a partial-hospitalization program ("PHP"). PHPs provide intensive outpatient treatment for patients

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

suffering an "acute exacerbation" of a chronic mental illness. Devotions was one of several satellite PHPs that Riverside General Hospital ("Riverside") operated. Earnest Gibson, III ("Gibson III"), was the CEO, president, and administrator of Riverside. His son, Earnest Gibson, IV ("Gibson IV"), operated Devotions.

Riverside and its affiliated PHPs, including Devotions, paid "marketers" for patient referrals. Sharonda Holmes worked for Gibson IV and Devotions as a marketer. Gibson IV instructed Holmes to bring in patients who were eligible for Medicare and had a mental-health diagnosis. Devotions did not provide Holmes with any marketing materials. Instead, she found patients by targeting personal-care homes. She would take personal-care homeowners to lunch to encourage them to send their patients to Devotions, and she would make residents gift bags to incentivize them to attend the program. Gibson IV paid Holmes between $225 and $300 for each patient that was admitted to Devotions and attended the program for at least 20 hours per week—i.e., the patients for whom Devotions could bill Medicare.

Crane worked with Holmes as a recruiter for Devotions. In an interview with FBI Special Agent Stephen Sandh, the lead agent on the Riverside case, Crane admitted that he was paid for patient referrals. Crane told Sandh that he was paid between $1,000 and $1,500 in cash every two weeks for these referrals. Devotions did not pay Crane when the patients he referred were in between admissions to the program; he was only paid when his patients attended Devotions. When Crane left Devotions in 2012, he tried to take his patients to two other PHPs, one of which also paid him for his patients. Crane admitted to Sandh that he knew the payments were wrong but he needed the money.

A grand jury indicted Gibson III, Gibson IV, Crane, and four others with conspiracy to receive healthcare kickbacks, in violation of the Anti-Kickback

## No. 17-20776

Statute.[1] *See* 42 U.S.C. § 1320a-7b(b). The jury found Crane and his co-defendants guilty. Crane appeals, arguing that the evidence at trial was insufficient to support his conviction.

## II.

We review de novo the district court's denial of Crane's motion for judgment of acquittal. *United States v. Perez-Ceballos*, 907 F.3d 863, 866-67 (5th Cir. 2018). Even so, "review of the sufficiency of the evidence is highly deferential to the verdict." *Id.* at 867 (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)). We "accept all credibility choices and reasonable inferences the jury made to support its verdict." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018). "A conviction may not rest on 'mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference,'" but we will affirm "if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (first quoting *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011); then quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Anti-Kickback Statute proscribes "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) . . . (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." § 1320a-7b(b)(1)(A). It also prohibits the payment of any remuneration "to any person" in exchange for such patient referrals. § 1320a-7b(b)(2)(A).

---

[1] Crane's co-defendants were also charged with specific violations of the Anti-Kickback Statute, money laundering, and conspiracy to commit healthcare fraud, but Crane was not implicated in these charges.

No. 17-20776

To prove a conspiracy to violate the Anti-Kickback Statute, the Government must show:

> (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*United States v. Gibson*, 875 F.3d 179, 187-88 (5th Cir. 2017) (quoting *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013)); *see also* 18 U.S.C. § 371. "The defendant must have 'acted willfully, that is, with the specific intent to do something the law forbids.'" *Id.* at 188 (quoting *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004)).

## III.

We find the evidence presented at trial sufficient to support the jury's conclusion that Crane knowingly and willfully received kickbacks.

The most significant evidence against Crane came from Sandh's testimony. Sandh testified that Crane confessed to receiving payments for patient referrals. Crane also told Sandh that he knew the payments were wrong. To be sure, "an accused may not be convicted on his own uncorroborated confession." *United States v. Deville*, 278 F.3d 500, 506 (5th Cir. 2002) (quoting *Smith v. United States*, 348 U.S. 147, 152 (1954)). But the Government corroborated Crane's confession by presenting "independent evidence which would tend to establish the trustworthiness of [Crane's] confession." *Id.* For example, the Government presented additional evidence that Crane received kickbacks through Holmes's testimony. In addition to her testimony that she personally received payments for patient referrals, Holmes testified that she knew Crane as a fellow recruiter at Devotions and that Crane told her he was also paid to bring patients to Devotions. Holmes also testified that on occasion, she would reach out to a personal-care home, but the homeowner would tell

her that the home was already working with Crane. And consistent with Crane's statement to Sandh that he was paid in cash, Holmes testified that Crane offered to let Holmes bring patients in under his name when Holmes had trouble with her checks bouncing.

The Government also submitted into evidence Devotions' "Marketer's [sic] List," which further corroborates Crane's confession that he was paid for patient referrals. Kristen Behn, Devotions' office manager, testified that the document lists the patients each recruiter brought to Devotions and indicates which patients were eligible for Medicare. Behn also testified that Gibson IV used the list to pay the recruiters. If Devotions could not bill Medicare for a patient, the recruiter would not be paid for that patient. Behn further testified that Crane would "ask for a copy [of the marketers' list] periodically so that he could make sure that [Behn] had his list correct"; this was important to Crane because he wanted to make sure "he would get paid correctly."

The Government also introduced evidence corroborating Crane's confession that he knowingly violated the law. Okechukwu Ofoegbu, an ambulance company administrator, testified that Crane referred a patient to Ofoegbu for $800. He also testified that Crane insisted that he be paid in cash and that the two met at a McDonald's, rather than at Riverside, because it would seem suspicious to discuss such matters at Riverside. *See United States v. Tooker*, 957 F.2d 1209, 1217 (5th Cir. 1992) (finding evidence of efforts to conceal transaction suggested defendant knew actions were wrong).

Crane concedes that Sandh's testimony is "evidence in the record that Mr. Crane received kickbacks." But he argues that the testimony is insufficient to support his conviction because Sandh "deliberately chose" not to record his interviews with Crane. This is a challenge to the jury's credibility determination, a decision we cannot revisit. *See Deville*, 278 F.3d at 505-06 (reversing trial court's entry of judgment of acquittal based on concern over

"reliability of the memory of the law enforcement agents who testified" regarding defendant's confession because trial court erroneously weighed agents' credibility); *see also Spalding*, 894 F.3d at 181 (noting that appellate court must "accept all credibility choices . . . the jury made to support its verdict"). Moreover, the Government did not solely rely on Sandh's testimony to show that Crane received kickbacks. In addition to the above-described evidence, Behn testified that Crane would sometimes cover prescription drug copays for his patients, suggesting that he had an incentive to keep the patients in the program. And four recruiters (including Holmes) testified that they were also paid for patient referrals at Riverside-affiliated PHPs.

Crane argues that the Government's evidence only shows that he was paid for advertising Devotions' services, rather than receiving kickbacks, comparing his case to *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). But his attempt to analogize his case to *Miles* is unavailing. In *Miles*, we reversed the conviction of two defendants charged with paying healthcare kickbacks in violation of § 1320a-7b(b)(2). *Miles*, 360 F.3d at 481. Defendants had paid Premier Public Relations ("Premier") to distribute informational materials, such as literature, business cards, and occasional plates of cookies, to local medical offices. *Id.* at 480. If a doctor from one of these offices referred a patient to defendants' company, defendants would pay Premier $300, but Premier had "no role in selecting the particular home health care provider." *Id.* at 479-80. Because it was the doctors, not Premier, who chose where to send the patients, supplied the patients' billing information to defendants, and collected payments, we held that the defendants did not violate the Anti-Kickback Statute. *Id.* at 480-81.

We have discouraged attempts to construe *Miles* broadly, rejecting as "untenable" a district court's reading of *Miles* "to limit drastically the meaning of 'any person,' such that liability cannot attach unless the 'person' who

No. 17-20776

receives remuneration is a 'relevant decisionmaker' with formal authority to effect the desired referral or recommendation." *United States v. Shoemaker*, 746 F.3d 614, 627, 629 (5th Cir. 2014). Reasoning that § 1320a-7b(b)(2) broadly criminalizes referrals paid to "any person," we have explained that *Miles* "stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser 'unduly influence[s]' or 'act[s] on behalf of' the purchaser," the fact that the healthcare provider compensates the advertiser, on its own, is insufficient to support a conviction under the Anti-Kickback Statute. *Id.* at 628 (alterations in original) (quoting *Miles*, 360 F.3d at 480). Thus, *Miles* did not turn on the status of the payee as a "relevant decisionmaker" but on the "*payer's* intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *Id.*

We recently reaffirmed this understanding of *Miles* in Crane's co-defendants' appeal, rejecting the Gibsons' arguments that the payments did not go to a "'relevant decision maker for sending patients' to the PHPs" and that the payments did not "influence[] the independent medical judgment of a doctor concerning a patient's care." *Gibson*, 875 F.3d at 189. Again, we explained that "the [Anti-Kickback Statute] has no 'relevant decision maker' or 'medical judgment' requirement." *Id.* (quoting *Shoemaker*, 746 F.3d at 628-29). It was enough that the Gibsons made payments to the recruiters because "[t]he statute criminalizes payments made to 'any person' with the requisite intent." *Id.* (quoting § 1320a-7b(b)(2)(A)).

Although Crane received, rather than paid, referrals under § 1320a-7b(b)(1), the statutory language is similarly broad, criminalizing any receipt of remuneration for a patient referral. *See* § 1320a-7b(b)(1). Thus, it is irrelevant that Crane could not force his patients to attend Devotions and that he did not influence control over his patients' doctors. And the evidence at trial supports

7

the jury's conclusion that the payments to Crane were intended for patient referrals, not advertising services, and that Crane understood that the payments were for patient referrals. In addition to Crane's confession that he received payments for referring patients to Devotions and he knew the payments were "wrong," Behn testified that it was the recruiters (including Crane) who would provide the Medicare-billing information to Devotions, not the patients or their doctors. Behn also testified that Crane would sometimes pay his patients' copays, evidencing Crane's efforts to induce patients to stay at Devotions. In addition, Crane moved his patients to another PHP after he left Devotions, further showing his control over his patients. And Holmes testified that, as a recruiter, she never received any promotional materials with which she could market Devotions. This evidence is sufficient to support Crane's conviction. *See United States v. Ricard*, 922 F.3d 639, 643-44, 649 (5th Cir. 2019) (affirming conviction for conspiracy to pay and receive kickbacks where defendant was paid $250 to $300 each time she referred a patient and defendant threatened to transfer her patients to another provider).

In sum, we conclude that a rational juror could conclude that Crane conspired to violate the Anti-Kickback Statute. Sandh's, Holmes's, and Behn's testimony, as well as the marketers' list, support the conclusion that Crane was receiving kickbacks for patient referrals (rather than advertising services) and he knew the payments were unlawful. Thus, we hold that the evidence is sufficient to support Crane's conviction.

**IV.**

For the foregoing reasons, we AFFIRM the judgment of the district court.